**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 16-31119

United States Court of Appeals
Fifth Circuit

**FILED**
January 30, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

DOCTOR PRAMELA GANJI; ELAINE DAVIS,

      Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and KING and JONES, Circuit Judges.

CARL E. STEWART, Chief Judge:

After an eight-day jury trial, Defendants, Dr. Pramela Ganji and Elaine Davis, were convicted of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and health care fraud, in violation of 18 U.S.C. § 1347. Defendants now appeal their convictions and sentences. For the reasons that follow, we REVERSE and VACATE.

## I.     BACKGROUND

Christian Home Health Care ("Christian") was a home health agency owned by Elaine Davis and her husband, Walter Davis, Sr. since 1989. Christian provided home health care services to patients in Southern

No. 16-31119

Louisiana. Home health care services are those skilled nursing or therapy services provided to individuals who have difficulty leaving the home without assistance. These services are commonly provided to senior citizens.

The process for receiving home health care services begins when a physician identifies a patient as an eligible candidate. Usually, although not a legal requirement, a patient's primary care physician ("PCP") refers her for home health services. Then a nurse goes to the patient's home to assess if she is homebound, completing an Outcome and Assessment Information Set ("OASIS"). The nurse then develops a plan of care based on the OASIS and forwards that document to a physician for approval. This is typically the same physician who initiated the process. In 2011, Medicare implemented a face-to-face requirement to further ensure that medical professionals would not order home health care without ever seeing the patient. This required medical professionals to actually see the patient for the initial meeting, but "[t]he face-to-face patient encounter may occur through telehealth in person."[1] Regulations allow for medical professionals who are not physicians to complete the face-to-face encounter, but the professionals have to be under the supervision of a physician. A medical professional certifies that they completed this encounter by completing a face-to-face addendum. The agency then sends the addendum with the Form 485 certification forms, which were used to certify patients for home health care to Medicare for reimbursement. If the professional determines the patient is homebound, the agency staff

---

[1] 42 C.F.R. 424.22(a)(v)(B).

2

No. 16-31119

immediately provides that care.[2] The staff member keeps the certifying doctor updated and notifies her if the patient's needs change.[3]

In order to provide these services, Christian employed an administrative team and medical professionals, including clinical supervisors, registered nurses, licensed practical nurses, home health aides, medical consultants, and medical directors. Medical directors were practicing physicians who contracted with Christian to provide services including nurse training, medical advice, and patient care. The directors also certified patients for home health care. Christian paid medical directors $1,000 per month in exchange for their services and throughout the years, it contracted with many physicians. In 2010, Christian hired Dr. Ganji as a medical director in the New Orleans area. Dr. Ganji was a physician who owned a private practice and had previously worked in nursing homes and with other home health care agencies. To assist her with her new and continuing duties, Dr. Ganji entered into a collaborative agreement with Nurses Per Diem, an organization of nurse practitioners, to provide home visits to homebound patients. Cynthia Kudji, the nurse practitioner with whom Dr. Ganji closely worked, performed many of the initial face-to-face encounters. In 2012, Christian opened an office fifty miles north, in Ponchatoula to better serve the Hammond area. It later hired Dr. Winston Murray, Louella Hendricks, Kim Robinson, Kimberley Celestine, and Betty Walls. Although Christian had fewer than twenty-five patients when the

---

[2] Although federal and state governments audit agencies, the regulations do not require a government representative to verify that a patient is homebound before services are reimbursed.

[3] If after sixty days the nurse believes the patient still needs home health care, the process begins again at the OASIS stage, but no face-to-face form is required. *See* 42 C.F.R. 424.22(a)(v) ("A face-to-face patient encounter, which is related to the primary reason the patient requires home health services, [must occur] no more than 90 days prior to the home health start of care date or within 30 days of the start of the home health care and [must be] performed by a physician or allowed non-physician practitioner as defined in paragraph (a)(1)(v)(A) of this section.").

3

No. 16-31119

Davises bought the company out of bankruptcy, between 2007 and 2015, the years the conspiracy to commit health care fraud allegedly took place, Christian cared for 350–400 patients at any given time.

In 2007 the United States Justice Department established a Medicare fraud task force.[4] Since then, more than 400 individuals have been prosecuted for defrauding the health care program of $1.3 billion. Notably, an individual who is a shadow in the current cast of characters was swept up in this crackdown: Mark Morad.[5] Morad owned and operated a home health empire in Southern Louisiana that toppled when he was indicted and pled guilty to defrauding Medicare of millions of dollars. When that regime fell, other agencies scrambled to scavenge Morad's patients and provide work for those former Morad employees who the Government had not publicly implicated in the conspiracy. Christian was one of these agencies.

The Government's discovery of the alleged Christian scheme was rather peculiar. The FBI initiated an investigation after one of Christian's patients, Simone Joseph, filed a complaint. Joseph was the plaintiff in an unrelated personal injury lawsuit, and that suit revealed that her medical history included false statements. She complained that co-defendant, Dr. Godwin

---

[4] Press Release, Dep't of Justice, *National Health Care Fraud Takedown Results in Charges Against Over 412 Individuals Responsible for $1.3 Billion in Fraud Losses*, (July 13, 2017), https://www.justice.gov/opa/pr/national-health-care-fraud-takedown-results-charges-against-over-412-individuals-responsible; *see also* Rebecca Ruiz, *U.S. Charges 412, Including Doctors, in $1.3 Billion Health Fraud*, N.Y. TIMES (July 13, 2017), https://www.nytimes.com/2017/07/13/us/politics/health-care-fraud.html.

[5] Mark Morad was the owner of three corporations "purportedly engaged in the business of providing home health services to Medicare beneficiaries." *United States v. Morad*, No. CRIM.A. 13-101, 2014 WL 68704, at *1 (E.D. La. Jan. 8, 2014). In 2013, he and four other individuals were charged with conspiracy to commit health care fraud and conspiracy to pay and receive health care kickbacks in violation of 18 U.S.C. § 371. *Id.* Mark Morad pled guilty to conspiracy to commit health care fraud and conspiracy to falsify records in a federal investigation on December 17, 2014.

No. 16-31119

Ogbuokiri, billed Medicare multiple times although she had only seen him once.

The subsequent investigation into Joseph's claims uncovered a scheme where, according to the Government, Christian employees recruited Medicare beneficiaries in exchange for incentives, which ranged from $100 bonuses to trips to Las Vegas, Nevada. To receive the incentives, Christian employees had to recruit prospective patients who were both eligible for Medicare and immediately ready for Christian hospice or home health care services. If the PCP did not certify the patient or the patient did not have a PCP, Christian's medical directors would do so. From January 2007 through January 2015, Christian submitted 14,891 claims for home health care and related services to Medicare. These claims were worth approximately $33,232,134, and Medicare paid around $28,265,071 on those claims.

The investigation resulted in an indictment charging:

- Davis, Dr. Ganji, and Dr. Ogbuokiri with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count One);

- Davis and Dr. Ogbuokiri with health care fraud, in violation of 18 U.S.C. § 1347 for submitting fraudulent Medicare claims with regard to Simone Joseph (Count Two);

- Davis and Dr. Ogbuokiri with health care fraud, in violation of 18 U.S.C. § 1347 for submitting fraudulent Medicare claims with regard to Leon Pate (Count Three);

- Davis and Dr. Ganji with health care fraud, in violation of 18 U.S.C. § 1347 for submitting fraudulent Medicare claims with regard to Carolyn Stewart (Count Four); and

- Davis and Dr. Ganji with health care fraud, in violation of 18 U.S.C. § 1347 for submitting fraudulent Medicare claims with regard to Jean Wright (Count Five).

5

No. 16-31119

During the trial, the Government presented testimony from case investigators, former Christian nurses and doctors, Dr. Ogbuokiri's patients, and Dr. Jan Cooper, Carolyn Stewart's PCP. Much of the Government's case hinged on the testimony of its cooperating witnesses, Dr. Murray, Louella Hendricks, and Kimberley Celestine, who admitted to fraudulently certifying patients for home health care. In the scheme, Hendricks and Celestine referred patients to Christian, taking the certification form to Dr. Murray for certification. Without extensive review of the patient's record or thorough inquiry into their homebound status, Dr. Murray signed the documents. Christian nurses, usually those who certified the patient, would then perform services for individuals who were ineligible and Christian would receive Medicare payments.

The Government's dependence on these witnesses is almost as peculiar as the scheme's discovery. Notably, these individuals worked in the Hammond area, while Dr. Ganji and Davis worked sixty miles away in the New Orleans area. Additionally, Celestine and Hendricks worked together for Morad's agencies before coming to Christian. Furthermore, Celestine and Hendricks's working relationship with Dr. Murray predated their move to Christian. When the nurses left their former employer for Christian, they immediately took the patients they brought with them to Dr. Murray for certification. Unlike other salient cases involving conspiracy to commit health care fraud, here the Government presented eighteen witnesses, none of whom could provide direct evidence of their alleged co-conspirator's actions because the witnesses never acted with the defendants to commit the specific charged conduct.

At the close of the Government's case-in-chief, the parties all filed Rule 29 motions for judgment of acquittal and renewed the motions before deliberations. The district court denied these motions. Following the trial, the jury convicted Dr. Ganji and Davis of Count 1 (conspiracy to commit health

care fraud) and Count 4 (health care fraud with regard to Stewart) and returned not-guilty verdicts on all of the remaining counts. Dr. Ogbuokiri, whose patient interaction initiated the investigation, was acquitted of all charges against him.

The district court sentenced Dr. Ganji to seventy-two months' imprisonment, to be followed by two years of supervised release, and ordered that she pay Medicare $5,048,518 in restitution. The court sentenced Davis to ninety-six months' imprisonment, to be followed by two years of supervised release, and ordered that she pay Medicare $9,305,647.26 in restitution.  On appeal, Dr. Ganji and Davis argue that the district court erred in denying their motions for acquittal because the evidence presented at trial was insufficient to support their convictions. They additionally challenge the district court's intended loss and restitution calculations. Davis further contends that the district court erred in allowing evidence of referral fees and crossover beneficiaries.[6]

## II.    DISCUSSION

When a defendant moves for acquittal in the district court, challenging the sufficiency of the evidence, this Court reviews the district court's denial de novo. *United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016). Appellate review is highly deferential to the jury's verdict, and a verdict is affirmed unless, viewing the evidence and reasonable inferences in light most favorable to the verdict, no rational jury "could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *See United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (quoting *United States v. Roetcisoender*, 792

---

[6] Because the Panel reverses the conviction, we do not address the sentencing issues and those evidentiary issues challenging the admission of referral fees and crossover beneficiaries.

F.3d 547, 550 (5th Cir. 2015)); *see also United States v. Miles*, 360 F.3d 472, 478 (5th Cir. 2004) (vacating a jury conviction when "a rational jury could not find" an essential element of the crime). Nevertheless, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996). Although the jury may make factually based inferences, "a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980).

A. Conspiracy

To support a conviction under 18 U.S.C. § 1349, the Government must prove beyond a reasonable doubt that: "(1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement . . . with the intent to further the unlawful purpose." *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015) (quoting *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012)).

Agreements need not be spoken or formal, and the Government can use evidence of the conspirators' concerted actions to prove an agreement existed. *See Grant*, 683 F.3d at 643. However, an agreement is a necessary element of conspiracy, and as such, "the Government must prove [its existence] beyond a reasonable doubt." *United States v. Arredondo-Morales*, 624 F.2d 681, 683 (5th Cir. 1980) (citing *Patterson v. New York*, 432 U.S. 197, 210 (1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."). The Government may establish any element through circumstantial evidence. *See United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014). However, "[p]roof of an agreement to enter a conspiracy is not to be

lightly inferred." *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971). "Mere similarity of conduct among various persons and the fact that they have associated with or are related to each other" is insufficient to prove an agreement. *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978).

1.  Dr. Ganji

Dr. Ganji argues that the evidence was insufficient to sustain a conviction of conspiracy to commit health care fraud because there was no evidence of an agreement to defraud Medicare. The Government acknowledges its lack of direct evidence and instead argues that the circumstantial evidence sufficiently proved a concert of action, which illustrated a conspiratorial agreement. The actions the Government based its argument on were: (1) Dr. Murray's fraudulent behavior as medical director; (2) Dr. Ganji's $1,000 monthly check; and (3) her increase in patient referrals.  From this, the Government argues the jury could have inferred an agreement.

Conspiracy is the agreement to join a common scheme to commit an unlawful goal. *See Monsanto Co., v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 754 (1984). "[T]he crime of conspiracy condemns the agreement itself. . . . [T]he agreement itself is the criminal act." *United States v. Alvarez*, 610 F.2d 1250, 1253–54 (5th Cir. 1980). Without an agreement, there is no conspiracy. *See id.* Conspirators do not enter into an agreement by happenstance, and because an agreement is the essential element of conspiracy, an agreement to commit a crime cannot be lightly inferred. *See Johnson*, 439 F.2d at 888. "[E]ach party must have intended to enter into the agreement and the schemers must have had a common intent to commit an unlawful act." *Alvarez*, 610 F.2d at 1255.

"What people do is logical, albeit, circumstantial, evidence of what lies in their mind." *Id.* at 1256.  As such, the law has evolved to accept concerted action when a formal agreement cannot be found. Nevertheless, this concert of action must illustrate a "conscious commitment to a common scheme designed

to achieve an unlawful objective." *Monsanto*, 465 U.S. at 754. The actions and the surrounding circumstances must be incriminating enough to warrant a finding that the Government proved the existence of an agreement beyond a reasonable doubt. *See id.* The actions surrounding the defendant and the co-conspirators' conduct, taken together, must show they intentionally entered into an agreement. *See id.* Concerted action between the conspirators illustrates that an agreement had to exist because the individuals would not have otherwise acted in that particular manner. *See, e.g.*, *United States v. Cessa*, 785 F.3d 165, 179–80 (5th Cir. 2015) (holding that a defendant would not have otherwise expected front money for more than 500 pounds of drugs or believed that the supplier would accept the drugs back after the deal failed if there was no agreement to participate in a conspiracy to distribute drugs); *Arredondo-Morales*, 624 F.2d at 684 (holding that there must have been an agreement to transport undocumented immigrants into the United States because the defendant would not have otherwise taken the keys and loaded the undocumented individuals into the car without further instruction).

Concert of action can be proven through indirect, circumstantial evidence. *See Tunica Web Advert. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 409 (5th Cir. 2007). However, when proving an agreement exists by using the concert of action theory, the Government must present evidence of the *conspirators' individual actions* that, taken together, evidence an agreement to commit an unlawful objective beyond a reasonable doubt. *See Monsanto*, 465 U.S. at 754; *Grant*, 683 F.3d at 643–44; *Arredondo-Morales*, 624 F.2d at 684.

Although this Court has not frequently decided health care fraud cases on the basis of concerted action, it has addressed the theory in other criminal contexts. In *Arredondo-Morales*, a jury convicted Arredondo-Morales and twenty-three others of conspiring to encourage and induce the entry of undocumented individuals into the United States. *Arredondo-Morales*, 624

F.2d at 682. The scheme involved undocumented individuals gathering in Juarez, Mexico to await the next crossing. *Id.* When a sufficient amount of people accumulated, they would meet at a co-conspirator's house. *Id.* After paying the co-conspirator, she would lead the individuals across the river to the El Paso headgates. *Id.* Co-conspirators, like Arredondo-Morales, waiting on the Texas side of the river, would then drive the undocumented individuals to Denver or Albuquerque. *Id.* On appeal, Arredondo-Morales conceded that an agreement existed but contended that there was not sufficient evidence that she joined that agreement. *Id.* at 683. We disagreed, holding that the concert of Arredondo-Morales and her co-conspirators' actions illustrated her intentional agreement to join the crime. *Id.* at 684. The Government had in its arsenal a participant of the scheme, Valle-Borrelli, who legally drove the car used in the scheme into the United States. *See id.* He testified that he saw Arredondo-Morales at the El Paso headgates where a co-conspirator had led the undocumented individuals to the Rio Grande. Without speaking he gave her the keys on the banks of the Rio Grande; he then observed the undocumented individuals get into the car and Arredondo-Morales drive away. This Court held that although there was no direct evidence of Arredondo-Morales joining the agreement, the evidence revealed actions that she would not have otherwise taken in the absence of knowingly and intentionally entering the agreement. *Id.*

In *Grant*, a medical fraud case, the Government sought to sustain on appeal a conviction found on indirect evidence of concerted action. 683 F.3d at 641, 643–44. A jury convicted Dr. Grant and two others of conspiracy to commit health care fraud, and this Court held that the conduct was sufficiently incriminating to establish an agreement. *Id.* In that scheme, Onward Medical Supply fraudulently billed Medicare for unnecessary durable medical equipment ("DME"). *Id.* at 641. To complete the fraud and submit

reimbursement claims, a physician had to sign a certificate of medical necessity. *Id.* To accomplish this, a co-conspirator paid hundreds of dollars for DME prescriptions with Dr. Grant's forged signature. *Id.* An Onward employee, who knew Dr. Grant's signature, told a mutual friend of the forgeries. *Id.* at 642. Dr. Grant visited Onward to review the prescriptions and agreed "to redo the prescription and sign it with his signature." *Id.* at 642. On appeal, Dr. Grant contended that the evidence was insufficient to show that he joined a conspiratorial agreement. *Id.* at 643. We disagreed, holding that there was sufficient evidence of Dr. Grant and the Onward employees' concerted effort to defraud the Government. *Id.* at 644. The record revealed testimony that a co-conspirator told Dr. Grant that he received prescriptions with Dr. Grant's forged signature; the co-conspirator admitted to Dr. Grant that he paid the doctors at Dr. Grant's facility $100 per prescription. Instead of reporting this fraud, two witnesses testified that Dr. Grant demanded payment to re-sign the fraudulent prescriptions. *Id.* at 643. Doris Vinitski, who ran Onward, testified that Dr. Grant demanded $10,000 to re-sign the prescriptions, which she paid. *Id.* at 644. We held that even if the jury did not believe the testimony regarding the actual agreement, the co-conspirator's concerted actions sufficiently supported an inference of an agreement. *See id.*

The quality and probative strength of the Government's "concerted action" evidence in this case falls well short of the threshold met in *Arredondo-Morales* and *Grant*. Doctors and nurses who were previously associated with Christian spoke of their own fraudulent actions, but they never testified that they agreed with Dr. Ganji or Davis to carry out these activities. Louella Hendricks testified that she recruited patients and took them to Dr. Murray's private practice for certification. She testified to visiting patients every week, knowing that they were not homebound. However, Hendricks was directly asked, "[D]id you ever put in anywhere in your notes, 'I was in that patient's

home and I have determined that that patient was not homebound,' ever?" Hendricks answered, "No." Hendricks's supervisor and friend of more than ten years, Kimberley Celestine, testified that she also recruited Medicare patients and set up their appointments with Dr. Murray in order for them to receive a home health care referral. Counsel for Davis asked, "In anywhere in your notes that you recall right now, did you ever write in your notes: This patient is not homebound?" Like Hendricks, Celestine answered, "No."

Dr. Murray corroborated Hendricks's and Celestine's testimonies. He testified that he believed he was supposed to refer patients to home health care at Christian because unlike his other patients, "a hundred percent of the patients that came to see [him] . . . asked to be referred for home health." Of the many aides at Christian, Dr. Murray testified that only Celestine, Hendricks, and Kim Robinson, all located in the Hammond area, brought him patients to certify. When asked if he ever consulted the PCP or talked to anyone about the patients' past medical history, Dr. Murray answered, "No." Dr. Murray testified that he referred one hundred percent of those patients who requested home health care even though, in hindsight, he believed only ten percent were eligible. Dr. Ganji's counsel asked, "At the time you were in your office doing your evaluation of those patients, you believed that they were homebound . . . And you put in your notes and in your orders what you believed in good faith those patient[s'] medical condition to be, correct?" Dr. Murray answered, "Correct." He stated that although he believed those patients were homebound when he certified them, he later saw some of them around town, making him question his earlier diagnosis.

Although these witnesses admitted to their own fraud, they did not implicate Dr. Ganji. They repeatedly testified to their own monetary motivations for acting fraudulently. Dr. Murray, Hendricks and Celestine testified about their scheme to defraud Medicare. They all previously worked

together for another home health agency. Even after that agency closed, they continued their fraudulent practices. The Government's witnesses did not testify that they worked in conjunction with Dr. Ganji. In fact, both Dr. Murray and Hendricks testified that they did not know Dr. Ganji. Dr. Murray was directly asked, "Now, you've never worked with Dr. Ganji, have you? . . . Do you know her?" Dr. Murray replied, "No." When Dr. Ganji's counsel asked if Hendricks knew Dr. Ganji, Hendricks answered, "I don't remember her. I really don't."[7]

In the vast majority of concert of action cases, the Government presents an insider with direct evidence of the conspiratorial scheme who testifies to the individual actions she completed and the actions the defendant took to meet their common unlawful goal. Usually, the Government presents a co-conspirator who was involved in the specific conspiracy charged. Here, no such person exists. To sustain a conspiracy conviction, the record must show evidence that Dr. Ganji agreed to join in the unlawful plan. The evidence proved that (1) Dr. Murray, who previously held a similar position, defrauded Medicare, and when Dr. Ganji accepted the job, she (2) received a monthly check of $1,000 and (3) began referring more patients to Christian than before. These actions, whether viewed individually or in concert, are insufficient to prove that Dr. Ganji agreed with anyone to defraud Medicare. While there was ample evidence that nurses referred patients to Christian who they knew were not homebound and secured signatures from Dr. Murray, there was no evidence that Dr. Ganji followed this same practice.

---

[7] Of the Government's eighteen witnesses, Samantha McGee who worked for Christian for less than two months after leaving Mark Morad's employ, was the only one to testify about Dr. Ganji. However, she testified that Dr. Ganji worked for MD2U, a company to which McGee sent referral forms for doctors to sign. Dr. Ganji was never affiliated with MD2U. And on cross-examination, McGee stated that she knew nothing about Dr. Ganji's patient care or medical practice.

Furthermore, Dr. Ganji provided testimony of her innocence that went unanswered by the Government. Dr. Ganji's extensive, undisputed testimony differentiated her forty-year practice from Dr. Murray's. The Government presented evidence that Dr. Ganji rarely personally visited the patients she certified. In response, Dr. Ganji, who cared for patients in her private practice, at nursing homes, and at other home health care agencies, testified that nurse practitioners conducted the visits when she could not.[8] When asked if she "believed[d] that this face-to-face encounter with the nurse practitioner was permissible, Dr. Ganji answered, "Yes." This statement was not rebutted by the Government and this practice is allowed by the regulations. 42 C.F.R. 424.22.[9]

---

[8] She specifically testified that:

The nurse practitioner goes and does the initial assessment . . . takes a history and she performs a physical examination and notes all her medications . . . the activities the patient does and then what kind of services she's going to need. She brings that to my office. And then, meanwhile, I also obtain records of that patient from different hospitals if they were ever admitted. And then, you know, we get paperwork from the home health agency . . . So once I get that, I look at her notes and then I review . . . all the records that are available to me and compare those notes with the hospital records, with the subspecialist's records, and the records that the Christian Home Health or any other agencies has provided to me. And then based upon the review of the diagnosis, I come up with the treatment plan.

[9] (A) The face-to-face encounter must be performed by one of the following:

(1) The certifying physician himself or herself.
(2) A physician, with privileges, who cared for the patient in an acute or post-acute care facility from which the patient was directly admitted to home health.
(3) A nurse practitioner or a clinical nurse specialist (as those terms are defined in section 1861(aa)(5) of the Act) who is working in accordance with State law and in collaboration with the certifying physician or in collaboration with an acute or post-acute care physician with privileges who cared for the patient in the acute or post-acute care facility from which the patient was directly admitted to home health.
(4) A certified nurse midwife (as defined in section 1861(gg) of the Act) as authorized by State law, under the supervision of the certifying physician or under the supervision of an acute or post-acute care physician with privileges

No. 16-31119

The Government also presented evidence that Dr. Ganji signed blank certification forms and posited that she did so in order to assist Christian in carrying out its fraudulent practice. When confronted with the signed blank forms, Dr. Ganji testified,

> Usually [there] is a sheet preceding this sheet that is the face-to-face encounter. And then preceding these sheets, I have notes from the nurse practitioners. And I also have paper charts from different hospitals or the primary care physicians and also Christian Home Health Services. So preceding these sheets, there are several documents that I would have reviewed.

In an additional effort to compare Dr. Ganji's practice to Dr. Murray's, the Government asked Dr. Ganji about her failure to keep and maintain personal records for each patient. To this, Dr. Ganji responded, "Christian Home Health kept all the records of OASIS and the nurses' documentation. It was brought to me whenever they brought the 485s, paper charts were brought to me." Dr. Ganji indicated that she kept records for patients for which she was the PCP, but Christian kept records of those patients for whom she was the attending physician. The Government did not rebut this testimony which aligns with a reasonable interpretation of the regulations which requires "[t]he provider must obtain the required certification and recertification statements [and] keep them on file for verification by the intermediary, if necessary." 42 C.F.R. 424.11(a). From this evidence a reasonable juror could not infer beyond a reasonable doubt that Dr. Ganji agreed to commit health care fraud.

---

who cared for the patient in the acute or post-acute care facility from which the patient was directly admitted to home health.

(5) A physician assistant (as defined in section 1861(aa)(5) of the Act) under the supervision of the certifying physician or under the supervision of an acute or post-acute care physician with privileges who cared for the patient in the acute or post-acute care facility from which the patient was directly admitted to home health.

42 C.F.R. 424.22(a)(v)(A).

Here, the Government relied solely on inferences to support the fraud charge and attempted to use those same inferences to support a larger agreement. The Government's theory, void of testimonial support, was that because Dr. Murray held the same position as Dr. Ganji, they must have conducted their practices similarly. The trial record rebuts the Government's theory and amply shows that these two physicians, who carried out private practices in two different locations, conducted those practices differently. The Government only presented evidence of Dr. Murray's illegal activity. On these facts alone, the Government cannot sustain its burden against Dr. Ganji. These inferences and the remainder of the record are insufficient to support Dr. Ganji's conviction beyond a reasonable doubt.

Exhibit 133, created by statistician Michael Tabor, illustrated the percentage of Christian patients Dr. Ganji referred to home health care. The Government emphatically points out that before Dr. Ganji became a medical director, she was only responsible for 0.25% Christian's referrals, but that number jumped to 26% after she became a medical director.  Dr. Ganji referred one patient in 2008, and 123 patients in 2010, her first year as a medical director.

Although the Government depended on the jury inferring guilt from the numbers, a look at the record, including the expert's charts and his testimony explaining how the charts were developed, reveals the meaning behind these numbers. Before Dr. Ganji was involved with Christian, she did very little business with the agency. Although she testified that she referred many patients to home health care, not many selected Christian as their agency of choice. The Government did not dispute her testimony of her past practices and did not present evidence that the total number of patients that she referred for home health care increased. The most a jury could infer from this evidence was that instead of having no preference for where her patients received care,

now that she was affiliated with Christian, she suggested her patients choose its services. One may question this practice because Dr. Ganji went from only receiving Medicare reimbursements from these beneficiaries for being their primary care physicians, to receiving multiple reimbursements coinciding with any work she did with Christian regarding the patients (e.g., certifying them for home health care, recertifying them, overseeing the medical professionals administering direct care, etc.). But this is not illegal, and it is insufficient to sustain an inference that she agreed to defraud Medicare.[10]

Though not as nefarious as the Government's preferred inference, the record substantiates that once Dr. Ganji became affiliated with a specific home health care agency, her patients followed her instead of having to establish a new doctor-patient relationship with a medical professional at a different home health care agency. Dr. Ganji spent the majority of her life practicing medicine and building her own private practice. She testified that she had extensive experience in nursing homes as well as with other home health care agencies. Here, the Government failed to present evidence that allowed any rational juror to infer the existence of a conspiratorial agreement beyond a reasonable doubt. *See Miles*, 360 F.3d at 478 (holding that the Government failed to present evidence allowing a rational jury to find that the defendant was a wholly illegitimate enterprise as required by the money laundering statute).

2. Davis

The evidence against Davis suffers from the same inadequacy: the Government falls short of proving an agreement. Importantly, the direct evidence favors Davis. The Government's witness, Dr. Murray, specifically

---

[10] Furthermore, we note that, although Dr. Ganji took the stand, the Government did not ask her about her increase in referrals or question her about Exhibit 133. Instead, the Government brought the exhibit up only when asking its own expert how he created the exhibit and in the Government's closing statements when it told the jury to review the exhibit in the jury room.

testified that he never agreed with Davis to defraud Medicare. When asked of his initial interaction with Christian, Dr. Murray stated, "[Davis's] son and a DME company came to my office and . . . they said, 'I would like to send you a contract to be our medical director.'" He further testified that a week later, the director of nursing, Samara Davis, came to his office to discuss the specifics of the position. Furthermore, when eliciting facts surrounding Dr. Murray's firing, the Government asked Dr. Murray, "What did you do when you arrived at Elaine Davis['s] office in Ponchatoula?" Dr. Murray stated, "Well, she introduced herself to me because I had never met her before that." Although his testimony indicated that Dr. Murray and Davis had no prior interactions that would allow for the insidious agreement, the Government did not address it. Moreover, when Dr. Murray, Celestine, and Hendricks were specifically asked if they told Davis or Christian that their patients were not homebound, they all answered, "No."

Again acknowledging the lack of direct evidence, in response to Davis's claim that the evidence was insufficient to prove she agreed to defraud Medicare, the Government argues that her knowledge, participation, and agreement could have been inferred. The Government's theory on appeal is that: (1) Davis paid bonuses and held contests to encourage her employees to increase Christian's patient size; (2) she hired staff who previously worked for Morad; and (3) after discontinuing Christian's professional relationship with Dr. Murray because he had been indicted, Davis asked him to come to Christian's office to sign documents, including certification forms. Davis was the owner and director of Christian. The Government contends that the illicit scheme began and ended with her. It began when Davis offered incentives to employees who recruited the most new patients. It ended when she signed payroll checks that included the bonuses to employees and payments to

Christian medical directors. The Government alleges that her actions purposefully encouraged fraudulent behavior.

The Government showed that for a period, Davis paid her employees $100 referral fees for each patient they recruited and in 2013 she implemented a contest for her employees to recruit more patients. When asked, "Did you think you were doing anything wrong when you paid these fees?" Davis answered, "Absolutely not." Davis further testified that the spirit contest served as "a morale booster for staff" and both the contest and the bonuses were conducted openly, as evidenced by the 1099s and the contest flyer. The Government did not rebut this good faith defense, and notably charged no one in this case with violating the Kickback Statute.

Depending, again, on the testimony of former Morad employees, the Government presented evidence that it argues warrants an inference that Davis agreed to participate in a conspiracy to defraud Medicare because she hired individuals from Mark Morad's agencies. Without more, the Government argues that from this information the jury could infer that Davis hired these individuals to commit a crime for Christian. These individuals were not indicted or charged when Christian began its professional relationship with them. Arguably, neither Davis nor the Government knew they conspired with Morad. Although the Government argues that this was the convicting evidence, it is axiomatic that argument is not evidence. This argument is weakened in the face of direct testimony from Dr. Murray, Hendricks, and Celestine that Davis never agreed with them to commit health care fraud and they avoided telling Davis or anyone at Christian of their activities. The Government forcefully argues that Davis was enough of a mastermind to will the employees in the Hammond area to commit health care fraud without ever telling them to or even ratifying their actions, yet she was careless enough to not only hire individuals who were likely under Government surveilance, but

to also get Dr. Murray to fraudulently sign documents while he was currently under federal indictment.

Finally, the Government points to the nefarious Ponchatoula meeting. It argues that Davis would not have otherwise asked Dr. Murray to meet her to sign documents that included certification forms had she not agreed to participate in a conspiracy to defraud Medicare. Again, here the direct evidence is not on the Government's side. Only Dr. Murray and Davis were at this meeting. Although Dr. Murray provided testimony that after being fired, Davis asked him to meet her at the Ponchatoula office to sign paperwork, he also specifically testified that he did not agree with Davis, formally or otherwise, to defraud Medicare. Nevertheless, the Government argues that from this meeting, the jury could have inferred that Davis and Dr. Murray had an agreement that, as the medical director, he would sign certification forms without reviewing any patient records.

Here, again, the record illustrates a different, reasonable explanation for the meeting. Christian severed its relationship with Dr. Murray. At that time, Dr. Murray was indicted for health care fraud. Samara Davis testified that before the working relationship ended, Dr. Murray was backlogged on completing paperwork, and Christian continuously attempted to get his

21

No. 16-31119

signature.[11] Dr. Murray attested to this.[12] Davis and Dr. Murray testified that Davis called Dr. Murray into the Christian offices outside of Hammond, where

---

[11] Q. Did there come a time when Dr. Murray was terminated from his duties at Christian Home Health Care?
A. Yes.
…
Q. Had it been a problem in the past with getting Dr. Murray to sign documents?
A. Yes.
Q. Do you recall specifically, at about the time that he was terminated, sending him documents to get him to sign them?
A. We consistently sent him documents up until that point, yes.
Q. Do you recall whether all of those documents were 485s?
A. I don't think all of them were 485s.
Q. What else would have been included in those documents if they weren't all 485s?
A. Any verbal orders that were obtained while the nurses were in the field, like if a patient had a change in status or medication or -- some of those problems were included.
Q. Why did you need for Dr. Murray to sign those documents?
A. Well, if -- because he was the physician at the time seeing the patients.
Q. How many times -- do you recall how many times you actually had to call him or contact him before he actually came in to sign the documents?
A. Well, documents were sent out every day. And if the person that was tracking orders didn't receive them back timely, they had steps to follow. After seven days, they would call. After 14, they would maybe fax. After 21, they would -- we would send them out with the marketers, the orders. Then after 30, they would call letting me know and I would call the physician. So I called them a lot.

[12] Q. And this was a fax from Christian Home Health?
A. Correct.
Q. And if we could go ahead and zoom in to the fax -- actually, just go to the next page. Okay. And this is dated September 25, 2014; is it not?
A. Yes.
Q. And that was before you were terminated from Christian Home Health?
A. Yes.
Q. And this fax is being sent to you and it's requesting that -- for you to sign certain orders?
A. Yes.
Q. Is there anywhere on this document, on this note here to you that says: I want you to sign these orders even if these patients are not homebound?
A. No.
Q. And if we could go to the next page. Do you see how this says "second request"?
A. Yes.
Q. And the next page, "second request"?

she gave Dr. Murray all of the backlogged paperwork she received from the administrative team. Without discussion, Dr. Murray signed the paperwork Christian repeatedly asked him to sign.

Again, to prove conspiracy, the Government must prove beyond a reasonable doubt the defendant knew of and participated in an agreement to commit a crime. It is not enough that the Government proves that the defendant knew something criminal was afoot. *Alvarez*, 610 F.2d at 1257.  The Government presented evidence that Davis was an accountant and Christian's owner, and her duties included signing checks and filling staffing positions.  It argued that, as such, Davis had significant oversight at Christian and the jury rightfully rejected her argument that she was unaware of any fraudulent certifications. In essence, the Government argued that the jury could infer that Davis had knowledge of the fraudulent activity and agreed to participate because one in that position *should have known* that some of Christian's nurses recruited and some of its medical directors certified patients who were not eligible for home health care services. Notably, the Government offers no case support for its argument.

The Government's attempt to ascribe Davis with knowledge and agreement because of her position in the company falls far short of the necessary requirement for guilt beyond a reasonable doubt. One cannot

---

A. Yes.
Q. Can you go to page 7, please? "Second request"?
A. Uh-huh (affirmative response).
Q. Next page, please. "Second request"?
A. Uh-huh (affirmative response).
Q. And so this had not been the first time that Christian Home Health had to contact you to ask you to sign the orders?
A. Correct. Correct.
Q. Did you ever take a look at these orders and say: No, I disagree with what's contained in those orders?
A. No.

negligently enter into a conspiracy. *See Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 526 (5th Cir. 2016) ("Civil-RICO conspiracy, however, cannot be premised on negligence. It requires an actual agreement between conspirators—they must specifically intend the illegal conduct."); *see also* Model Penal Code § 5.03 cmt. 2(c)(i) (1985) ("[W]hen recklessness or negligence suffices for the actor's culpability with respect to a result element of a substantive crime . . . there could not be a conspiracy to commit that crime.").

Furthermore, Davis testified that she did not have any medical training, was not qualified to make diagnoses, and depended on Christian's medical professionals "[o]ne hundred percent" in medical matters. She further testified that "the administrative office . . . confirmed [] the patients Ms. Hendricks and Ms. Celestine had brought in." The Government did not provide evidence refuting the testimony that Davis had little involvement in Christian's administrative matters and no involvement in its medical matters. It instead continuously pointed to Davis's payroll participation to illustrate her oversight at Christian and prove her participation in the conspiracy. This activity is insufficient to support an inference that she agreed to join Dr. Murray and the nurses' fraudulent activity. The Government had to prove that she knowingly agreed to participate in a common scheme to meet an unlawful goal. *See Monsanto*, 465 U.S. at 754. The evidence did not prove that Davis committed actions sufficient to show an agreement to defraud Medicare beyond a reasonable doubt.

We note that Davis's actions were nothing like most directors involved in other health care fraud cases. She testified that she did not participate in the day-to-day activity of processing the certification forms, which was completed by the administrative office. *But see, e.g., United States v. Fuchs*, 467 F.3d 889, 897 (5th Cir. 2006) (owner filled prescriptions for hydrocodone after his company generated the prescriptions online and paid a doctor, who

never examined the patients, to approve them). The contract between Christian and the medical directors provided for a flat rate, and, in accordance with health care regulations, that rate did not fluctuate based on the amount of patients the director referred. *But see, e.g.*, *United States v. Dailey*, 868 F.3d 322, 326 (5th Cir. 2017) (owner admitted to paying the doctor in exchange for signing certification forms without supervising the physician's assistant and testified that the doctor withheld forms if not paid). The record does not indicate that Christian paid doctors to sign documents. *But see, e.g.*, *Grant*, 683 F.3d at 643–44 (5th Cir. 2012) (director paid doctor to re-sign forged prescriptions for medical supplies). Furthermore, according to testimony, Davis's salary was, at most, $120,000. The Government provided no evidence that she received funds beyond her salary. So while the Government alleges that Medicare paid Christian an average of $3.5 million a year during the scheme, Davis only amassed 3.4% of those alleged ill-gotten gains.

Although the Government presented a plausible scheme of fraudulence, it did not implicate Davis in the scheme with proof beyond a reasonable doubt. The Government did not present sufficient evidence to allow any rational juror to infer that Davis agreed to participate in a conspiracy to commit health care fraud. As such, we must reverse.

B. Fraud

To prove health care fraud, in violation of 18 U.S.C. § 1347, the Government must show that the defendant knowingly and willfully executed "a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises," any health care benefit program's money in connection with the delivery of or payment for health care services. *See* 18 U.S.C. § 1347(a); *United States v. Imo*, 739 F.3d 226, 235–36 (5th Cir. 2014).

1.  Dr. Ganji

Only patients who were "homebound," under a certifying doctor's care, and in need of skilled services were eligible for the services Christian provided. The Government asserts that Dr. Ganji certified patients who were not under her care knowing they were not homebound. A person who is "homebound" has a serious medical condition that restricts her ability to leave the home. *Eghobor*, 812 F.3d at 356. Dr. Ganji asserted that there was insufficient evidence to prove that she certified Carolyn Stewart *knowing* that she was not homebound. The Government contends that Stewart was not homebound. Stewart's primary care physician testified that Stewart's mobility was not restricted. Nevertheless, the Government must provide evidence that the accused doctor executed a fraudulent scheme with knowledge that the patient was not homebound. *See* 18 U.S.C. § 1347(a); *United States v. Jackson*, 220 F. App'x 317, 323–24 (5th Cir. Mar. 2, 2007).

We acknowledge that the Government presented evidence of Dr. Ganji's participation in lax practices. However, Dr. Ganji was not convicted of patient negligence, keeping subpar files, or haphazardly conducting her business. She was convicted of defrauding the Government by certifying Stewart for home health care, knowing that she was not homebound and not under her care. Beyond proving that Stewart did not need home aid, the Government was to prove, beyond a reasonable doubt, that Dr. Ganji was aware of that reality. Unlike other health care fraud cases presented to this Court, the Government did not provide testimonial or documentary evidence proving that Dr. Ganji knew Stewart was not homebound. *But see, e.g.*, *Grant*, 683 F.3d at 645 (holding that the defendant knew wheelchairs were not medically necessary because the patients would not accept or actively and physically rejected delivery); *United States v. Murthill*, 679 F. App'x 343, 350 (5th Cir. Feb. 13, 2017) (co-conspirator testified that he and Murthill discussed that the patient

was not homebound). It presented evidence of Stewart's primary care physician's knowledge but it failed to present any evidence imputing that knowledge to Dr. Ganji. The evidence allowed the jury to infer that Stewart was not homebound, but it cannot stretch that into a second inference that Dr. Ganji *knew* Stewart was not homebound.

The Government further contended that Dr. Ganji committed fraud because she certified Stewart even though Stewart was not under Dr. Ganji's care. "A beneficiary is 'under the care of a physician' when the treating physician has determined that home health care is necessary." *See Eghobor*, 812 F.3d at 356. The Government contends that a doctor must be a patient's primary care physician in order for the patient to be under their care. This is not a requirement established by the regulations. *See* 42 C.F.R. § 424.22(a)(v)(A). In fact, the regulations provide that face-to-face patient encounters may be performed by physician assistants, nurse practitioners, or clinical nurse specialists. *See id.* Dr. Ganji averred that attending physicians and primary care physicians are both treating physicians when responsible for the care of a patient. She testified that when working in hospitals, nursing homes, or other home health care agencies, she served as the attending physician and patients were under her care even though she was not their primary care physician. If she cared for them at the facility, they were under her care. Although the process usually begins with a primary care physician, this cannot be the case when a patient does not have a primary care physician. The Medicare guidelines do not prohibit treating physicians who are not primary care physicians from beginning the home health care process. *See id; Eghobor*, 812 F.3d at 356. Therefore, Dr. Ganji cannot be held liable for fraudulence as a result of activity that is legal.

2. Davis

The Government based Davis's fraud completely on the actions of Dr. Ganji. It provided no evidence of Davis's own fraudulent activity as it pertains to Stewart. There was not sufficient evidence to show an agreement to commit health care fraud, and the Government did not otherwise attempt to show that Davis individually committed the fraud alleged in Count 4. The Government presented no evidence that Davis was made aware that Stewart was not homebound, *but see, e.g.*, *Murthill*, 679 F. App'x at 350, or that she discovered that information herself, *but see, e.g.*, *Grant*, 683 F.3d at 645. Furthermore, when directly asked if she ever met Carolyn Stewart, Davis answered, "No." The Government left this testimony unanswered. Thus, there is insufficient evidence to show that she knowingly executed a scheme to defraud Medicare.

## III.    CONCLUSION

For the forgoing reasons, we REVERSE and VACATE the defendants' convictions of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 and health care fraud in violation of 18 U.S.C. § 1347.