# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 9, 2023

Lyle W. Cayce
Clerk

No. 21-20564

United States of America,

*Plaintiff—Appellee*,

*versus*

Jason Edward Simpson,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CR-630-3

Before Higginbotham, Jones, and Oldham, *Circuit Judges*.
Per Curiam:*

A jury convicted Jason Edward Simpson on three drug-related counts and one gun-related count. On direct appeal, Simpson challenges the sufficiency of the evidence. We affirm.

I.

On August 14, 2018, an undercover Houston Police Department ("HPD") detective texted a narcotics supplier to buy a pint of promethazine

---

* This opinion is not designated for publication. *See* 5th Cir. Rule 47.5.

containing codeine (*i.e.*, "lean syrup"). Later that day, two undercover detectives met the supplier—Fernando Melendez—at a house on Santiago Street in Houston. Melendez's supplier, Jose Garza, arrived shortly thereafter with the lean syrup. The detectives exchanged marked money for the pint of lean syrup. But later lab tests revealed that the pint contained no controlled substances.

On August 19, 2018, Melendez texted an HPD detective and informed him that he had "tabs and bars" available. "Tabs" refers to ecstasy or MDMA; "bars" refers to Xanax. Melendez quoted the detective $1,500 for 2,000 ecstasy pills. Three days later the detectives again met Melendez at the Santiago Street house. When they arrived, they noticed a black Lincoln Navigator and a white Buick Enclave parked outside. Melendez told one detective to hop in the Navigator's back passenger seat. Garza sat in the driver's seat, and Melendez sat in the front passenger seat. The defendant—Jason Edward Simpson—sat in the backseat next to the HPD detective. Simpson said he supplied the pills, the pills were "A1," and that he used to supply "the entire Third Ward" of Houston. After these introductory remarks, Simpson handed a bag of pills to the undercover detective, who said the pills looked good and asked if he could get a bigger quantity. Although the initial agreement was for 2,000 pills, there were about 1,350 in the bag. Simpson adjusted the rate accordingly, and the detective paid Melendez $1,350 for the pills. Melendez kept a small portion of the money and gave a larger portion to Simpson.

On August 30, 2018, Melendez agreed to sell 5,000 ecstasy pills to the HPD detectives for $4,000. Later that day, the detectives arrived at the Santiago house and saw a red Pontiac G6 and a black Toyota Tacoma parked out front. When they arrived, Melendez was waiting outside. Simpson hopped out of the Tacoma with a plastic grocery bag. He held it open and showed the detectives a kaleidoscopic mix of tablets. Melendez directed

No. 21-20564

everyone inside the red Pontiac. Same seats as last time: Garza in the driver's seat, Melendez in the front passenger seat, and Simpson in the backseat with the HPD detective. Simpson placed the white grocery bag on the center console and explained that the pills were better quality than last time because they were from a different source. The HPD detective said the money was in his car and went to get it.

That's when the arrest team swooped in and arrested everyone, including Simpson. (Michael Manning and G.H., who remained in the Tacoma while the meeting went down in the Pontiac, were arrested too.) The arrest team recovered the grocery bag full of pills from the Pontiac, a loaded 7.62x25mm handgun[1] on the front passenger floorboard of the Pontiac, and an accompanying magazine. They also recovered a handgun under the driver's seat of the Tacoma, a loaded 9mm XTM Springfield Armory pistol. Garza later testified that (1) the 7.62x25mm handgun in the Pontiac belonged to him, (2) Simpson supplied the pills for both the August 22 and August 30 transactions, and (3) he and Simpson had been good friends from their neighborhood for three years.

The Government charged Simpson with five drug-trafficking-related offenses. A jury convicted Simpson on four of the five counts. *See* 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C) (conspiracy to possess with intent to distribute 3,4 methylenedioxy-methamphetamine (ecstasy)) (Count One); 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii), 18 U.S.C. § 2 (possession with intent to distribute 50 grams or more of methamphetamine) (Count Two); 21 U.S.C.

---

[1] The Government refers to this weapon as a "7.62 caliber handgun." Red Br. 15. But "caliber" refers to imperial cartridge diameters, not metric ones. Thus, a "7.62 caliber" weapon would shoot a bullet that is 7.62 inches wide, which is fatter than modern naval artillery rounds. The weapon found on the floorboard of the Pontiac was a PW Arms pistol chambered in 7.62x25mm Tokarev.

No. 21-20564

§ 841(a)(1), (b)(1)(B)(viii), 18 U.S.C. § 2 (possession with intent to distribute 500 grams or more of methamphetamine) (Count Three); 18 U.S.C. §§ 924(c)(1)(A), (o), 2 (conspiracy to use, carry, or possess a firearm during and in relation to a drug trafficking offense) (Count Five). The district court gave Simpson a below-Guidelines sentence: four concurrent 168-month terms of imprisonment and five years of supervised release. Simpson timely appealed.

## II.

Simpson raises two sufficiency-of-the-evidence challenges.[2] Under our precedent, where the defendant chooses not to present his own evidence, a boilerplate objection at the close of the Government's case is sufficient to preserve a sufficiency challenge. *See United States v. Kieffer*, 991 F.3d 630, 634 & n.1 (5th Cir. 2021) (simply asserting "Rule 29" is enough); *id.* at 637–41 (Oldham, J., concurring in the judgment) (criticizing that result). Simpson made such a boilerplate objection here, so our review is *de novo*. *See id.* at 634 (majority op.). Even so, the sufficiency standard is extremely difficult to meet: We will affirm the jury's verdict "unless, viewing the evidence and reasonable inferences in the light most favorable to the verdict, no rational jury could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (quotation omitted). Simpson cannot come close to meeting that standard.

---

[2] Simpson also raises a statutory-interpretation challenge but concedes it is foreclosed by our precedent. *See United States v. Betancourt*, 586 F.3d 303, 308–09 (5th Cir. 2009) (concluding that "knowing" in 21 U.S.C. § 841(a) does not apply to the type and quantity determinations under 21 U.S.C. § 841(b)).

## A.

Simpson argues the evidence the Government introduced to prove that he conspired to possess a firearm in relation to a drug trafficking crime was insufficient to support his conviction. We disagree.

To sustain a conviction for conspiracy to possess a firearm during a drug trafficking crime, the Government must prove (1) an agreement to commit the crime, (2) the defendant knew about the agreement, and (3) the defendant voluntarily participated in the agreement. *See United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc). But a formal agreement is not required; the jury may infer knowledge of and involvement in the conspiracy from the defendant's conduct and the surrounding circumstances. *See United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012); *see also United States v. McClaren*, 13 F.4th 386, 414 (5th Cir. 2021) ("Conspiracies must feature an agreement, although the agreement can be informal and unspoken. The agreement can be proven by circumstantial evidence alone." (quotation omitted)).

A rational juror had ample evidence to convict Simpson of conspiracy to possess a gun. The arresting officers found handguns in both vehicles at the scene of the August 30 drug transaction, and Simpson was charged with conspiracy to possess the loaded PW Arms 7.62x25mm pistol found in the Pontiac G6 in relation to a drug trafficking offense. Garza testified that the pistol belonged to him. Simpson and Garza were neighborhood friends for at least three years before the transaction, and Simpson was a routine supplier for Garza. An HPD detective testified that he found the handgun in plain view on the front passenger floorboard at Melendez's feet. A magazine and unspent cartridges of ammunition were also found in the Pontiac G6. A second handgun (a loaded 9mm XTM Springfield Armory handgun) was found under the driver's seat in the Tacoma. Manning admitted the

No. 21-20564

Springfield pistol found in the Tacoma belonged to him. It is undisputed that Simpson was present in both cars during the encounter before the arrest team arrived.

Moreover, after his arrest, Simpson sent two inmate emails that FBI agents intercepted. In those emails, Simpson stated that the reason he was present on August 30 was to provide security and to prevent a robbery. Based on these emails, an FBI agent told the jury Simpson was present on August 30 as "muscle" and testified that guns are usually carried or nearby and available during such drug transactions. *See United States v. Walker*, 750 F. App'x 324, 328 (5th Cir. 2018) (guns are a "tool of the drug trade").

True, Simpson's co-conspirators cooperated with the Government and testified in hopes of getting more lenient sentences. But credible testimony from cooperating co-conspirators is sufficient to sustain a conspiracy conviction. *See McLaren*, 13 F.4th at 400 ("Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature."). And nothing indicates that the testimony of Garza, Melendez, or Manning was either incredible or unbelievable. Thus, we reject Simpson's first sufficiency challenge.

B.

Simpson also argues that the evidence supporting his conviction for possession of 500 grams or more of a mixture containing detectible amounts of methamphetamine is insufficient. Specifically, he claims that the Government's forensic analyst used a defective sampling plan to test Simpson's drugs. Again, we disagree.

The forensic analyst used a sampling plan that is consistent with industry practice for testing large samples. He divided the pills into groups by color, randomly selected 29 samples from each color group to test, and

then tested them using two different testing methods (chemical spot test and GCMS). The sampling plan, chemical spot test, and GCMS were all performed in accordance with the standard protocol promulgated by field experts. After verifying that all the instruments were performing properly, the forensic analyst administered the two different tests on each of the 29 pills in the color subsets, and they all tested positive for methamphetamine. The total net weight of the entire sampling plan was 529.90 grams, which is over 500 grams.

A rational jury could obviously rely on the forensic analyst's uncontroverted testimony that the method he used to test the methamphetamine was consistent with industry practice. Simpson points to no authority showing that the industry-wide practice the forensic analyst used here was inaccurate or unreliable.

AFFIRMED.