# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 3, 2023

Lyle W. Cayce
Clerk

————————

No. 21-11225

————————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

TAMMIE L. LITTLE; LAILA N. HIRJEE, *Medical Doctor*,

*Defendants—Appellants*,

CONSOLIDATED WITH

————————

No. 21-11228

————————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

MARK E. GIBBS, *Medical Doctor*,

*Defendant—Appellant*.

---

Appeals from the United States District Court
for the Northern District of Texas
USDC Nos. 3:17-CR-103-12,
3:17-CR-103-5 and 3:17-CR-103-6

---

Before Richman, *Chief Judge*, and Stewart and Douglas, *Circuit Judges*.

Per Curiam:[*]

Three codefendants appeal their various convictions stemming from a multi-million-dollar healthcare conspiracy that involved fraudulent certification and recertification of patients as terminally ill and eligible for hospice care. Finding no reversible error, we affirm.

**I**

Defendants challenge the sufficiency of the evidence to support their convictions. Our sufficiency review is highly deferential to the jury's verdict, and "[a]s a result, the recounting of the evidence that follows is in the light most favorable to the jury's verdict."[1]

Novus was a hospice provider located in Dallas, Texas, and co-founded by Bradley Harris (Harris) and Amy Harris (Amy Harris) in 2012. Harris oversaw Novus's operations. Drs. Mark E. Gibbs and Laila N. Hirjee were medical directors for Novus. Tammie L. Little was a registered nurse (RN). Melanie Murphey was an administrator who had no medical training.

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

[1] *United States v. Mesquias*, 29 F.4th 276, 279 (5th Cir.) (citing *United States v. Moreno–Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)), *cert. denied sub nom. McInnis v. United States*, 143 S. Ct. 115 (2022), *and cert. denied sub nom. Mesquias v. United States*, 143 S. Ct. 269 (2022).

No. 21-11225
c/w No. 21-11228

Under applicable regulations, hospice is a service for the "terminally ill" that provides palliative care rather than curative care. "Terminally ill" means "that the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."[2] Hospice care is among the benefits covered by Medicare. Medicare pays hospice providers' claims automatically in order to expedite reimbursement. A web of statutes and regulations governs whether Medicare will pay for hospice services. For a hospice claim to be eligible for Medicare reimbursement, a medical director must have enrolled the patient after "certify[ing] in writing . . . that the individual is terminally ill . . . based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness."[3] The medical director can rely on the records and recommendation of the patient's attending physician to certify a patient as terminally ill and admit him or her to hospice. A patient can be recertified after their first 90 days on hospice without a face-to-face visit. If a patient is still alive after 180 days, Medicare requires that a face-to-face visit accompany the medical director's recertification for hospice. A face-to-face visit is also required for every following recertification, which must occur no more than 60 days after the previous one.

Novus exploited Medicare's reimburse-first-verify-later system. Because Medicare pays a flat rate per day for patients who are receiving hospice care regardless of the amount of care provided or the resulting costs to the hospice, it can be profitable to have low-acuity patients who are designated as hospice patients for long periods of time. Novus's business model was to target patients who had a medical diagnosis that would qualify

---

[2] 42 C.F.R. § 418.3.

[3] 42 U.S.C. § 1395f(a)(7)(A)(i)(II).

No. 21-11225
c/w No. 21-11228

them for hospice but who were not "imminently dying." Staff at Novus would market to these desirable types of patients, and, if those patients agreed to receive hospice services from Novus, the staff would then use pre-signed physician's orders to enroll patients.

As discussed above, Medicare has certain requirements for recertifying patients for hospice. Relevant here, the medical director's 180-day recertification must be accompanied by a form attesting to the medical director's face-to-face visit with the patient and a physician's narrative explaining "why the clinical findings of that face-to-face encounter support a life expectancy of six months or less." At Novus, the medical directors used nurses' notes to fill out the narrative section of the face-to-face forms, and Harris told them what dates to put on the forms. Face-to-face visits by the directors did not occur.

Ultimately, Novus's business model had inherent limitations. Medicare imposes an aggregate cap on the amount of money it will pay a hospice in a year. When Medicare has paid a hospice provider more than its cap allows, it claws back the excess payments. Novus exceeded its cap in 2012 and 2013, and, by its calculations, it had exceeded its cap by millions in mid-2014. To avoid liability for the excess payments, Novus needed to increase the number of patients who were hospice patients for a short time. Bluntly, Novus needed patients who would die quickly or who could be discharged before the end of their first 90-day benefits period.

To meet these needs, Harris entered into an agreement with Ali Rizvi, the owner of Express Medical. Rizvi provided Little with login credentials to Express Medical's electronic records database. Little and Harris used Express Medical's database to look for patients who had been diagnosed with a disease that would qualify them for hospice care. Little or Amy Harris would then contact those patients and try to enroll them with Novus.

4

No. 21-11225
c/w No. 21-11228

In 2015, the Centers for Medicare and Medicaid Services (CMS) suspended payments to Novus because of "credible allegations of fraud." Harris, Amy Harris, and Dr. Gibbs responded by transferring some of Novus's patients to another hospice company, Dependable. Dr. Gibbs served as Dependable's medical director until CMS suspended payments to Dependable.

A grand jury indicted Harris, Amy Harris, Rizvi, Murphey, Dr. Gibbs, Dr. Hirjee, Little, and others for conspiracy to commit healthcare fraud and other crimes. Little and Drs. Hirjee and Gibbs proceeded to trial. Harris and Murphey, among others who had been indicted, pled guilty and testified at trial.

The jury found each defendant guilty of the allegations in Count One, conspiracy to commit healthcare fraud. The jury also found: (1) Dr. Gibbs guilty of Counts Five and Six, substantive healthcare fraud, but acquitted him on a third count, and guilty of Count Fifteen, conspiracy to obstruct an administrative proceeding; (2) Dr. Hirjee guilty of Counts Eight, Nine, and Ten, substantive healthcare fraud, and guilty of Count Fourteen, unlawful distribution of a controlled substance; and (3) Little guilty of Counts Two, Three, and Four, substantive healthcare fraud. The district court sentenced Dr. Gibbs to 156 months of imprisonment; Dr. Hirjee to 120 months; Little to 33 months. The district court ordered Dr. Gibbs to pay $27,978,903 in restitution jointly and severally with other coconspirators; and Little to pay $366,493.12 jointly and severally with other coconspirators. The defendants timely appealed.

We first address challenges to the sufficiency of the evidence—first to the conspiracy counts, then to the substantive healthcare fraud counts, and finally to the defendant-specific counts of distribution of a controlled substance and conspiracy to obstruct justice. We then address issues relating

5

No. 21-11225
c/w No. 21-11228

to the conduct of trial, including the jury instructions given on two counts, the denial of a motion for a new trial, and the admission of evidence. Finally, we address challenges to restitution and sentencing.

## II

We review sufficiency of the evidence challenges de novo, but we remain "highly deferential to the verdict."[4] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[5] "The evidence is viewed in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict,"[6] and we resolve any conflict in the evidence "in favor of the jury's verdict."[7] "We will not second guess the jury in its choice of which witnesses to believe."[8] We begin by addressing the sufficiency of the evidence as to the conspiracy to commit healthcare fraud counts; then the substantive healthcare fraud counts; then the distribution of a controlled substance count for Dr. Hirjee; and last the conspiracy to obstruct justice count for Dr. Gibbs.

---

[4] *Moreno–Gonzalez*, 662 F.3d at 372 (quoting *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002)).

[5] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[6] *Moreno–Gonzalez*, 662 F.3d at 372 (quoting *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997)).

[7] *Id.* (citing *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990)).

[8] *United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) (citing *United States v. Jones*, 839 F.2d 1041, 1047 (5th Cir. 1988)).

No. 21-11225
c/w No. 21-11228

## A

"A person commits health care fraud by 'knowingly and willfully execut[ing] a scheme to defraud a government health care program like Medicare.'"[9] "A person is guilty of conspiring to commit health care fraud when he knowingly agrees to execute the fraud scheme with the intent to further its unlawful purpose."[10] To prove a conspiracy to commit healthcare fraud, the Government must show that: (1) two or more people made an agreement to commit healthcare fraud; (2) the defendant knew of the unlawful purpose of the agreement; and (3) the defendant joined in the agreement with the intent to further the unlawful purpose.[11] We first address Dr. Gibbs's arguments, then Dr. Hirjee's, and last, Little's.

## 1

Dr. Gibbs argues that the Government failed to establish that he "agreed to commit healthcare fraud." He provides two theories.

First, Dr. Gibbs contends that the Government did not present evidence proving he "knowingly participated in a scheme where he knew patients were certified for hospice when they were not hospice appropriate or that patients were kept in hospice when that was no longer appropriate." This argument misconstrues the theory of fraud underlying these charges. The fraud is the false certification of patients as terminally ill to enroll them as hospice patients and the false recertification to keep them as receiving

---

[9] *United States v. Mesquias*, 29 F.4th 276, 280 (5th Cir.) (alteration in original) (quoting *United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017)), *cert. denied sub nom. McInnis v. United States*, 143 S. Ct. 115 (2022), and *cert. denied sub nom. Mesquias v. United States*, 143 S. Ct. 269 (2022).

[10] *Id.* (citing *United States v. Njoku*, 737 F.3d 55, 63 (5th Cir. 2013)).

[11] *United States v. Hamilton*, 37 F.4th 246, 257-58 (5th Cir.), *cert. denied*, 143 S. Ct. 450 (2022).

7

hospice care. Those certifications and recertifications are false because Dr. Gibbs did not know whether the patients were eligible for hospice care, but he lent his signature to attest to Medicare that they were.[12] Another medical director following Medicare's requirements might have placed or kept certain patients in a hospice program, but that is not the point. Falsely certifying a patient who happens to be eligible does not make the certification less false.

Second, Dr. Gibbs avers that the Government failed to put on proof of an agreement, and "[t]here is no way to distinguish lax medical practices with participation in the common scheme." Contrary to this assertion, the Government did introduce evidence of an agreement between the coconspirators, as well as evidence supporting a conclusion that Dr. Gibbs's actions amounted to willful participation, not just haphazard medical practices.

The jury heard a recording of Dr. Gibbs, Murphey, Harris, and Amy Harris after CMS suspended payments to Novus. Murphey recorded the conversation without the others knowing. Amy Harris described moving Novus hospice patients to another hospice company, Optim, and that "we don't think that they're going to come after Optim because they're gonna

---

[12] *See United States v. Ramirez*, 979 F.3d 276, 278 (5th Cir. 2020) ("Ramirez defrauded Medicare. He falsely certified that Medicare beneficiaries needed a specialized form of nursing care called 'home health services.' Medicare pays for such services only where a physician certifies that he evaluated the patient face-to-face and decided that home health services were medically necessary. Ramirez signed hundreds of those certifications. But he did so without *meeting* the patients, much less evaluating them."); *United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017) ("The circumstantial evidence of fraudulent intent in this case is similar to what courts have found sufficient in other health care fraud schemes. [Defendants] had employees falsify patient files to comport with [partial hospitalization program] requirements, feigned participation in patient evaluations, and, as the owners of [Provider], reaped substantial profits from the scheme.").

No. 21-11225
c/w No. 21-11228

have to be able to find . . . a reason to do that. If they did, by that time, like worst-case scenario, we could then move to this other hospice that our names are not associated with." Dr. Gibbs then explained, "[T]he Optim thing is going to be tricky because, like we talked about earlier, they're going to really notice 200." Murphey clarified at trial that Dr. Gibbs was referring to Medicare noticing 200 Novus patients being moved to another company. The group then discussed "Plan C," which was to move Novus patients to Dependable, a hospice company owned by an associate of Harris, and which had no patients. Dr. Gibbs posed, "So your next question is: Is this kind of shady? And the answer is: Yes, absolutely, but we've worked in the gray areas for years and everybody does." Dr. Gibbs did assure Murphey that "we haven't done anything illegal at all," but Murphey testified that she believed he was trying to convince her to stay because, as Dr. Gibbs phrased it, she was "vital." Dr. Gibbs's involvement in planning the next steps after the CMS suspension, moving the Novus patients to Dependable, and acknowledgment of having "worked in the gray area for years" support a reasonable inference that Dr. Gibbs had been willfully participating in a scheme to defraud Medicare.

Aside from this recording, the jury also heard testimony about actions taken by Dr. Gibbs that indicate he was working in concert with the coconspirators to achieve the goals of the conspiracy. Murphey testified to receiving pre-signed documents from Dr. Gibbs, including physician's orders and face-to-face forms. Murphey, who was not a medical professional, used those pre-signed physician's orders to enroll new patients in hospice. Harris and Murphey testified to witnessing Dr. Gibbs complete face-to-face forms without visiting the patients in person. Harris explained at trial that he and Dr. Gibbs would go through patients' medical records, and Dr. Gibbs would write a physician narrative based on the recent nurse's notes. In order to make it difficult "to prove that he didn't do the visits," Harris instructed Dr.

No. 21-11225
c/w No. 21-11228

Gibbs to date the face-to-face certifications when Dr. Gibbs came to Novus's clinic and his other office was closed.

"In the vast majority of concert of action cases, the Government presents an insider with direct evidence of the conspiratorial scheme who testifies to the individual actions she completed and the actions the defendant took to meet their common unlawful goal."[13]  "Such testimony of a co-conspirator, as long as it is not incredible, is alone sufficient to support a conviction."[14]  Here, the jury heard the testimony of coconspirators Murphey and Harris, both of whom described the actions Dr. Gibbs took to further the conspiracy.  Those actions evidence his agreement to join in the scheme to defraud Medicare.  The jury also heard the recording of Dr. Gibbs describing how he and the others had been working in the "gray area."

Viewing this evidence in the light most favorable to the verdict, a jury could reasonably infer that Dr. Gibbs willfully joined in the conspiracy to defraud Medicare.

### 2

Dr. Hirjee argues that the Government failed to prove that there was a conspiracy and, if there was, that Dr. Hirjee willfully participated in it.

Like Dr. Gibbs, Dr. Hirjee argues that "the Government failed to show that between 2012 and 2014, Novus doctors and employees willfully certified any ineligible patients for hospice care."  She concedes that "the Government presented evidence that Dr. Hirjee and other Novus doctors signed blank hospice admission forms and Murphey filled in the information," but she asserts "there is no evidence that any blank form

---

[13] *United States v. Ganji*, 880 F.3d 760, 771 (5th Cir. 2018).

[14] *Mesquias*, 29 F.4th at 282.

signed by Dr. Hirjee resulted in the admission of an ineligible patient." Again, this misconstrues the underlying theory of fraud. Under Dr. Hirjee's interpretation, so long as Murphey happened to enroll only eligible patients, then no fraud occurred. That is not the fraud theory the Government presented to the jury. The fraud theory presented by the Government was supported by evidence—Harris testified about Novus's overarching business model, and he and Murphey testified about how individuals, including Dr. Hirjee, fit into the mechanics of that model in order to defraud Medicare.

Dr. Hirjee continues on to argue that, if there was a conspiracy, the Government failed to prove that she willfully agreed to it. She makes three assertions: (1) she was not intimately involved in Novus; (2) the Government failed to prove she falsely certified that she visited patients; and (3) the Government proved at most lax practices.

First, Dr. Hirjee likens her situation to that of the defendants in *United States v. Ganji*.[15] There, the Government's concerted-action evidence fell short because the witnesses "admitted to their own fraud, [but] they did not implicate [the defendant]."[16] *Ganji* is inapposite. Here, Harris and Murphey testified as to their own fraudulent actions *and* how they carried out those actions with Dr. Hirjee. The jury heard evidence of Dr. Hirjee pre-signing physician's orders used to admit patients to hospice; receiving patient narratives for face-to-face forms along with requests to date the forms as Harris directed; and leaving pre-signed, blank prescriptions for Harris or Murphey to retrieve. Dr. Hirjee also points to evidence that she refused to certify ineligible patients for hospice, and claims that she "hardly earned the sort of money that might tempt a doctor of her stature into risking decades in

---

[15] 880 F.3d 760 (5th Cir. 2018).

[16] *Id.* at 770.

federal prison." But the jury did not credit this evidence or make these inferences, and we will not second-guess the jury.[17] Ultimately, the Government needed to prove beyond a reasonable doubt that Dr. Hirjee willfully joined in a conspiracy to defraud Medicare, not that she was a key player or intimately involved.

Second, Dr. Hirjee argues that the Government failed to prove that she falsified face-to-face forms for recertification of hospice patients. Dr. Hirjee primarily re-presents evidence that the jury heard at trial. She points to witness testimony that she did complete face-to-face visits and visited her patients' facilities weekly. She suggests that while "the Government no doubt showed that Dr. Hirjee was on vacation on two dates on which she supposedly saw [three patients]" for face-to-face visits, "the Government did not show that she had not seen the patients on or about those dates—in other words, that the precise dates on the forms were not simply mistakes." She also suggests that "[i]t would make no sense to lie about something so simple and convenient." These are possible inferences that the jury could have drawn, but they are not the inferences it drew.

The Government responds by pointing to the evidence cutting the other way. Harris testified that Dr. Hirjee fraudulently certified that she conducted face-to-face visits that never occurred. As with Dr. Gibbs, Harris would instruct Dr. Hirjee to date the face-to-face certifications on days when it would be more difficult to prove that she had not performed the visit. Harris would fax Dr. Hirjee batches of narratives, written by nurses, along with blank face-to-face forms so that Dr. Hirjee could fill them out and then

---

[17] *See United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997) ("The evidence is viewed in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict." (citing *United States v. Jimenez*, 77 F.3d 95, 97 (5th Cir. 1996))).

sign and date them as directed by Harris.  Dr. Hirjee would sign the forms and put them under her doormat for Harris to retrieve.  Further, as discussed in more detail below regarding the sufficiency of the evidence as to the substantive healthcare fraud counts, the Government produced three face-to-face forms, signed by Dr. Hirjee, attesting that the visits with the patients occurred on a date when Dr. Hirjee was out of the country.  It was reasonable for the jury to infer from this evidence that Dr. Hirjee used the information provided by Harris to complete face-to-face forms rather than perform the encounters as Medicare requires.

Third, Dr. Hirjee argues that the Government proved nothing more than her lax practices.  She suggests that the evidence shows only that she "took it upon herself to defraud Medicare and Medicaid" because she was unaware that Harris did not care whether the face-to-face visits occurred.  In other words, she was acting independently of the conspiracy.  This argument ignores Harris's testimony describing the process of faxing Dr. Hirjee patient narratives and blank face-to-face forms and retrieving them once they were completed.  It also ignores the other evidence showing Dr. Hirjee worked in concert with the others, such as Murphey's testimony explaining Dr. Hirjee provided pre-signed physician's orders Murphey used to admit patients to hospice.

On the topic of lax practices, Dr. Hirjee contends that her practice of pre-signing blank prescriptions for controlled substances does not support the conclusion that she willfully joined in the conspiracy.  As it pertains to Count One, conspiracy to commit healthcare fraud, Dr. Hirjee's practice of pre-signing blank prescription pads supports an inference that she willfully joined in the conspiracy.  Dr. Hirjee suggests the jury could infer she pre-signed triplicates for other reasons—for instance, "so that drugs could be distributed quickly in the middle of the night," otherwise "[t]hey all would have issued [sic] had nurses awakened Dr. Hirjee."  But we draw inferences

in favor of the verdict. Further, even excluding from consideration Dr. Hirjee's practice of pre-signing blank prescription pads, the jury was presented ample evidence on which it could find Dr. Hirjee guilty of the conspiracy count.

Ultimately, the Government presented "insider[s] with direct evidence of the conspiratorial scheme who testifie[d] to the individual actions [they] completed and the actions the defendant took to meet their common unlawful goal."[18] This testimony was "alone sufficient to support a conviction."[19] Viewing the evidence and making inferences in the light most favorable to the verdict, a rational jury could have found that Dr. Hirjee knowingly participated in a scheme to defraud Medicare.

**3**

Little argues that the Government failed to "prove with any sufficient evidence that Little knowingly and willfully joined any agreement for any illegal purpose and with the intent to defraud Medicare." The Government charged Little with "conspiring with Harris, Rizvi, and Amy Harris to commit healthcare fraud by unlawfully (a) finding, (b) recruiting, and (c) enrolling ineligible patients in hospice." These were separate means that independently support her conspiracy conviction,[20] and importantly, they

---

[18] *See Ganji*, 880 F.3d at 771.

[19] *See Mesquias*, 29 F.4th at 282.

[20] *See United States v. Moparty*, 11 F.4th 280, 297 (5th Cir. 2021) ("The government presented two theories of fraud: one relating to the medical necessity and adequacy of the procedures performed, and another focused on how the procedures were billed. Moparty argues that Dr. Bungo's testimony demonstrates that Moparty lacked the necessary training to determine whether any particular test was necessary. He misconstrues the inquiry, however, because the government could bear its burden against him with evidence on the fraudulent billing practices alone.").

are distinct from the manner and means the Government alleged Drs. Gibbs and Hirjee employed in participating in the conspiracy.

Little contends that the Government failed to prove she unlawfully found patients by invading their privacy in violation of the Health Insurance Portability and Accountability Act (HIPAA). She attacks the Government's witnesses and their expertise on HIPAA, arguing that the jury did not have the background to decide whether Little violated patients' rights to privacy in their medical records. Even if there was insufficient evidence as to whether Little violated HIPAA, the Government can bear its burden for the conspiracy conviction by providing sufficient evidence on either of the other two theories: recruiting and enrolling ineligible patients.

As to those theories, the Government presented the following evidence. Harris testified that, after Novus realized the Medicare-cap issue in 2014, he and Little met with Rizvi to discuss generating new hospice referrals by using the Express Medical database. After Rizvi provided access to the database, Harris and Little searched for patients who could be enrolled and discharged after 90 days to offset Novus's liability. Indeed, there was evidence that Harris directed Little to discharge patients from hospice before their initial 90-day period expired. Harris testified that Little received bonuses for patients located through Express Medical's database, which was corroborated by text messages exchanged between Harris and Little.

The Government points to three patients in particular: R.C., B.B., and J.M. For each of these patients, the Government presented evidence that their information was obtained through the Express Medical database. Evidence corroborated Little admitting these patients to Novus hospice and then discharging them after 90 days. R.C. was alive at the time of trial, seven years after being admitted to hospice. J.M. passed away in 2022, likewise years after being put on hospice. These patients' longevity post-hospice

No. 21-11225
c/w No. 21-11228

admission is circumstantial evidence that they were ineligible for hospice.[21] A rational juror could infer that Little was enrolling patients who were not terminally ill, thereby defrauding Medicare.

Other circumstantial evidence further supports the inference that Little was unlawfully recruiting patients for Novus hospice. Murphey testified that to attract desirable patients, Little and Amy Harris would contact prospective patients and Little "pretend[ed]" to work as a "representative" for another company, encouraging patients to go on hospice with Novus. The jury also saw evidence that Novus staff were instructed to avoid using the word "hospice" when delivering a cane to R.C., which further supports the claim that Little was deceptive in her recruitment methods. Little testified in her defense, and she presented testimony that conflicted with the Government's evidence for the jury to consider. She claimed that she did not provide Harris with her login credentials for the Express Medical database, she did not look through Express Medical for potential patients, and she believed Harris was communicating the medical directors' orders when he directed her to discharge patients. It is the province of the jury to weigh such conflicting evidence and evaluate the credibility of witnesses, and it did not credit Little's testimony.

Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence of Little's willful and knowing participation in the scheme to sustain her conviction.

---

[21] *See Mesquias*, 29 F.4th at 282 ("[A]mple circumstantial evidence backed up the co-conspirators' testimony. The named patients were in hospice for an average of three years, a far cry from Medicare's six-months-to-live eligibility requirement.").

No. 21-11225
c/w No. 21-11228

**B**

A person commits healthcare fraud by knowingly and willfully executing a scheme to defraud a government healthcare program such as Medicare.[22] Under 18 U.S.C. § 1347(a), a person is guilty of healthcare fraud if he or she knowingly and willfully executes a scheme or artifice to (1) defraud any healthcare benefit program or (2) obtain, by means of false or fraudulent pretenses, representations, or promises, any healthcare benefit program's money in connection with the delivery of or payment for healthcare services.[23] We first address Little's arguments, then Dr. Gibbs's, and last, Dr. Hirjee's.

**1**

The jury found Little guilty of three substantive counts of healthcare fraud for her role in illegally finding, recruiting, and enrolling the three patients discussed above, R.C., B.B., and J.M. Little argues that the Government failed to prove she unlawfully recruited and admitted patients, raising many of the same points discussed above in Section II.A.3 as to Little's conviction on Count One. In addition to the analysis above, we provide the following.

Little suggests that the Government put on no evidence establishing that the three patients were ineligible for hospice when Little enrolled them. This is not the case. For instance, the Government introduced physician's notes from three weeks before B.B. was enrolled on hospice. Those notes indicated that B.B. was "[d]oing great; no active issue; vitally stable; not on any medicines; [and] walk[ing] with assistance." B.B.'s doctor

---

[22] *Id.* at 280.

[23] *Ganji*, 880 F.3d at 777.

17

recommended that she "continue low salt diet" and follow up with home healthcare. Likewise, for J.M., the notes from the physician visit one week before J.M. was enrolled on hospice indicated that J.M. was "alert" and had "no complaints." As mentioned above, J.M. was discharged after 90 days and lived until 2022. This evidence supports the claim that these patients were not terminally ill when enrolled on hospice. To the extent Little argues expert testimony was required, we have "decline[d] to impose such a requirement" in other healthcare fraud cases, and we decline to impose one here.[24] Little's arguments do not show that the jury lacked evidence to find her guilty.

**2**

The jury found Dr. Gibbs guilty on Counts Five and Six, which charged him with falsely certifying that he had conducted face-to-face visits with S.D. It found him not guilty on Count Seven, which charged him with the same conduct as to E.O. Dr. Gibbs argues that the Government failed to produce evidence establishing that the documents relating to S.D. were (1) authentic and (2) submitted to Medicare.

First, the Government did put on evidence establishing that the documents were authentic. Murphey testified that the signature on S.D.'s face-to-face certification belonged to Dr. Gibbs and that she watched him sign it. The jury was permitted to credit that testimony.[25] Dr. Gibbs is correct that the evidence generally established that "non-physicians at Novus forged documents, altered documents, and fraudulently worked

---

[24] *See United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017).

[25] *See United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) ("We will not second guess the jury in its choice of which witnesses to believe." (citing *United States v. Jones*, 839 F.2d 1041, 1047 (5th Cir. 1988))).

No. 21-11225
c/w No. 21-11228

around the physicians," but, for this document in particular, the Government presented evidence that Dr. Gibbs signed it. The jury could have reasonably concluded from Murphey's testimony that Dr. Gibbs signed S.D.'s face-to-face certification form, and we resolve conflicts in favor of the jury's verdict.[26]

Second, Dr. Gibbs's argument that "there was absolutely no evidence that the documents that the government used to tie Dr. Gibbs to S.D. were ever submitted to Medicare" also fails. The jury heard testimony that the face-to-face forms for S.D. were "uploaded into the [electronic medical record] and provided as part of the certification for continued eligibility for payment" from Medicare. The Government introduced an exhibit showing that Novus submitted claims and received payments from Medicare during the time periods when the face-to-face forms for S.D. bearing Dr. Gibbs's signature were dated. The jury also heard that such face-to-face forms were a condition of payment without which Medicare would not have paid claims. As the Government puts it, the face-to-face forms bearing Dr. Gibbs's signature were part of the "package" Novus used to bill Medicare for S.D. The Government did not need to prove that the document was submitted directly to Medicare to prove beyond a reasonable doubt that Dr. Gibbs committed healthcare fraud.[27] There was sufficient evidence to convict Dr. Gibbs of healthcare fraud.

_____

[26] *See United States v. Moreno–Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) ("[A]ny conflict in the evidence must be resolved in favor of the jury's verdict." (citing *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990))).

[27] *See United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014) ("A defendant need not have actually submitted the fraudulent documentation to Medicaid in order to be guilty of health care fraud or conspiracy to commit health care fraud." (citing *United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011))).

**3**

The jury found Dr. Hirjee guilty on Counts Eight, Nine, and Ten, which charged her with fraudulently certifying face-to-face visits for D.P., J.M., and J.F.  Dr. Hirjee reiterates several of the arguments she made in challenging the sufficiency of the evidence for Count One, which fail for the same reasons discussed above, as well as the additional reasons discussed below.

First, Dr. Hirjee argues that the Government failed to prove that she did not see the patients, "instead proving only that she did not see them on specific, immaterial dates."  The Government presented the following evidence.  For J.M.: On October 29, 2013, Harris faxed Dr. Hirjee a narrative and blank face-to-face form for J.M.  At the top of the narrative was written, "[J.M.] Date 10/24."  The completed face-to-face form for J.M. states that "I confirm that I had a face-to-face encounter with [J.M.] on 10/24/13" and is signed by Dr. Hirjee.  Testimony at trial established that Dr. Hirjee was in Hawaii on October 24, 2013.  For D.P. and J.F.: On April 29, 2014, Murphey faxed Dr. Hirjee narratives and blank face-to-face forms for D.P. and J.F.  The fax includes the request, "[P]lease date all of these 4/19/14."  The completed face-to-face forms for D.P. and J.F. state the encounters occurred on "4/19/14."  Testimony at trial established that Dr. Hirjee was in Mexico on April 19, 2014.  Dr. Hirjee's argument presents another possible inference the jury could have drawn from the evidence, but it is not the inference the jury ultimately drew.

Second, Dr. Hirjee argues that the "Government failed to prove that [these patients] were not eligible for hospice care and that the face-to-face certifications were material."  As discussed with respect to Count One above, the Government's fraud theory did not turn on whether the patients were ineligible.  The fraud turned on Dr. Hirjee attesting to Medicare that

she performed face-to-face encounters that she did not actually perform. Had Dr. Hirjee performed the encounters, she may have legitimately recertified the patients for hospice—the problem, according to the Government, is that she did not perform the encounters but filled out the face-to-face forms anyway. As to the materiality of the face-to-face forms, the Government introduced evidence showing that face-to-face forms were a condition of payment without which Medicare would not have paid claims.

Viewing the evidence and inferences in the light most favorable to the verdict, a rational jury could have concluded that Dr. Hirjee did not perform the face-to-face visits she attested to Medicare she performed, thereby defrauding Medicare.

## C

Count Fourteen charged Dr. Hirjee with unlawfully distributing and dispensing hydromorphone to L.V. outside the usual course of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. § 841(a). To convict Dr. Hirjee, the Government was required to prove that (1) she distributed or dispensed a controlled substance; (2) she acted knowingly and intentionally; and (3) she did so other than for a legitimate medical purpose and in the usual course of her professional practice.[28] "[A] practitioner is unauthorized to dispense a controlled substance if the prescription *either* lacks a legitimate purpose *or* is outside the usual course of professional practice."[29] After Dr. Hirjee's trial, the Supreme Court decided

---

[28] *United States v. Brown*, 553 F.3d 768, 780-81 (5th Cir. 2008); *see also United States v. Norris*, 780 F.2d 1207, 1209 (5th Cir. 1986).

[29] *United States v. Bennett*, 874 F.3d 236, 245 (5th Cir. 2017) (quoting *United States v. Armstrong*, 550 F.3d 382, 397 (5th Cir. 2008), *overruled on other grounds by United States v. Balleza*, 613 F.3d 432 (5th Cir. 2010) (per curiam)).

No. 21-11225
c/w No. 21-11228

*Ruan v. United States*,[30] holding that "[a]fter a defendant produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so."[31]

Generally, a preserved sufficiency challenge is reviewed de novo.[32] However, if a defendant "asserts *specific grounds* for a specific element of a specific count for a Rule 29 motion, [s]he waives all others for that specific count."[33] Dr. Hirjee's counsel argued orally and in writing for acquittal because the Government failed to prove beyond a reasonable doubt that the L.V. prescription was outside the usual course of professional practice and not for a legitimate medical purpose. She did not challenge the sufficiency of the evidence as to the *mens rea* element, and we review this unpreserved challenge for plain error.[34]

The Government presented the following evidence: Dr. Hirjee pre-signed "triplicates," the form that physicians use to prescribe schedule-II controlled substances like oxycontin, hydromorphone, morphine, and fentanyl. A triplicate is also known as a "C-II." The jury heard testimony from Harris and Murphey that Dr. Hirjee supplied pre-signed C-IIs, which were used to medicate Novus's hospice patients. Once Murphey had used all of Dr. Hirjee's triplicates, Murphey would text Dr. Hirjee that she needed more. The jury also saw messages between Dr. Hirjee and Harris

_____

[30] 142 S. Ct. 2370 (2022).

[31] *Id.* at 2375.

[32] *See United States v. Harris*, 740 F.3d 956, 962 (5th Cir. 2014).

[33] *United States v. Herrera*, 313 F.3d 882, 884 (5th Cir. 2002) (en banc) (per curiam).

[34] *See id.*

demonstrating how Dr. Hirjee pre-signed C-IIs and left them under her doormat for retrieval. As to L.V. in particular, Murphey testified to using a triplicate pre-signed by Dr. Hirjee to order hydromorphone, a painkiller, for L.V. Text messages corroborated Murphey's testimony.

As to Dr. Hirjee's preserved challenges, she first argues that "there is no evidence that [L.V.]'s [h]ydromorphone prescription was for an illegitimate purpose." Dr. Hirjee points to testimony establishing that hydromorphone is dispensed to treat L.V.'s condition. The logic of this interpretation is flawed. As the Government points out, "[u]nder Hirjee's theory, an office[] manager could write millions of prescriptions for hospice patients, and the doctor who pre-signed those prescriptions would be immune from prosecution unless the government could prove that the office manager chose a drug for which the patient had no need." The Government cites the Sixth and Eleventh Circuits, which reject Dr. Hirjee's interpretation.[35] We agree with those circuits. The question is whether Dr. Hirjee herself prescribed hydromorphone to L.V. for an illegitimate purpose, and a rational jury could conclude from the evidence that she did.

Dr. Hirjee further argues that it was not outside the usual course of professional practice for a doctor to pre-sign prescription forms. She points to "multiple defense witnesses [who] testified that hospice agencies use pre-

---

[35] *See United States v. Chaney*, 921 F.3d 572, 590-91 (6th Cir. 2019) ("As the district court made abundantly clear, a doctor prescribing opioid painkillers to anyone walking through the door is not saved if a person happens to have an underlying condition that could justify the prescription; likewise, a doctor who acts in good faith and with all due care but nevertheless issues a prescription to a patient who was merely faking symptoms is nevertheless acting with a legitimate medical purpose. To say otherwise would be absurdity."); *United States v. Abovyan*, 988 F.3d 1288, 1306 (11th Cir. 2021) ("The question is not whether a doctor could prescribe buprenorphine for legitimate medical addiction treatment actually being rendered, but whether Abovyan himself did prescribe buprenorphine for such actual addiction treatment.").

signed prescription forms" although this violates Texas medical regulations. As the Government explains, those witnesses testified to leaving pre-signed triplicates with properly designated nurses, not with anyone working for the hospice provider. In addition, multiple witnesses testified that they would not pre-sign triplicates, full stop. It is the province of the jury to weigh conflicting evidence. Resolving inferences in favor of the verdict, the jury had sufficient evidence to conclude Dr. Hirjee acted outside the usual course of professional practice.

Last, as mentioned above, although Dr. Hirjee preserved her sufficiency of the evidence challenge to this count, she did not preserve her *mens rea* argument, meaning we review for plain error.[36] Dr. Hirjee argues that "the Government failed to show that she knew she was acting in an unauthorized manner or intended to do so," as *Ruan* requires. "[W]e have summarized the plain-error test's application to unpreserved insufficiency claims by stating that the court will reverse only if there is a *manifest* miscarriage of justice."[37] Dr. Hirjee has not shown that her conviction on this count was a manifest miscarriage of justice. She signed prescription pads for schedule II drugs—drugs like morphine, cocaine, and oxycodone—and left them under her doormat. Non-medical professionals then used pre-signed triplicates to order medication for hospice patients.

We conclude that the evidence was sufficient to convict Dr. Hirjee on Count Fourteen.

---

[36] *See Herrera*, 313 F.3d at 884 ("Where, as here, a defendant asserts *specific grounds* for a specific element of a specific count for a Rule 29 motion, he waives all others for that specific count.").

[37] *United States v. Huntsberry*, 956 F.3d 270, 283 (5th Cir. 2020) (alteration and emphasis in original) (quoting *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) (en banc)).

No. 21-11225
c/w No. 21-11228

**D**

The superseding indictment charged Dr. Gibbs with conspiring with Harris and others to violate 18 U.S.C. § 1505 by moving Novus's operations and payments to a different hospice company to "circumvent the CMS suspension." The Government was required to establish beyond a reasonable doubt (1) the existence of an agreement to violate § 1505; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy.[38] Section 1505 makes it a criminal offense to "corruptly . . . obstruct[], or impede[] or endeavor[] to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States."[39] To prove a violation of § 1505, the Government must prove that (1) there was an agency proceeding; (2) the defendant was aware of that proceeding; and (3) the defendant intentionally endeavored corruptly to influence, obstruct, or impede the pending proceeding.[40]

Dr. Gibbs argues that there is "no testimony or evidence that [he] destroyed evidence, shredded paper, etc." He also suggests that "[t]he transfer of money could be a qualifying event if the records showing the transfer were deliberately obscured or destroyed," but "there was no effort to obliterate, alter, or amend" the bank records. This argument misconstrues the requirements of the offense. We have noted that § 1505 was "drafted with an eye to the variety of corrupt methods by which the proper

_____

[38] *See* 18 U.S.C. § 371.

[39] *Id.* § 1505.

[40] *See United States v. Warshak*, 631 F.3d 266, 325 (6th Cir. 2010); *United States v. Quattrone*, 441 F.3d 153, 174 (2d Cir. 2006); *United States v. Bhagat*, 436 F.3d 1140, 1147 (9th Cir. 2006).

administration of justice may be impeded or thwarted."[41]   Indeed, the Government points to two cases, one unpublished from our circuit[42] and one published from the Sixth Circuit,[43] involving similar facts and denying sufficiency challenges to § 1505 convictions.

As discussed with respect to Dr. Gibbs's conviction on Count One, the jury heard a recording of Dr. Gibbs's attempts to recruit Murphey in the plan to move Novus patients to Dependable, a different hospice company. Moving patients in order to continue billing Medicare would circumvent the CMS suspension of payments, which was an aspect of the CMS proceeding relating to the allegations of fraud leveled against Novus.[44]   Dr. Gibbs in particular raised concerns about Medicare "noticing" 200 patients being moved.  The Government also presented evidence that Dr. Gibbs and Harris succeeded in moving some patients, before Medicare suspended payments to Dependable as well.  The jury could conclude from this evidence that Dr. Gibbs and others agreed to circumvent the CMS proceedings in violation of § 1505.

---

[41] *United States v. Rainey*, 757 F.3d 234, 245 (5th Cir. 2014) (quoting *United States v. Griffin*, 589 F.2d 200, 206 (5th Cir. 1979)).

[42] *United States v. Veasey*, 843 F. App'x 555, 563-64 (5th Cir. 2021) (per curiam) (unpublished).

[43] *Warshak*, 631 F.3d at 325-26.

[44] *See Rice v. United States*, 356 F.2d 709, 712 (8th Cir. 1966) (explaining that, for § 1505, "[p]roceedings before a governmental department or agency simply mean proceeding in the manner and form prescribed for conducting business before the department or agency, including all steps and stages in such an action from its inception to its conclusion"); *see also Rainey*, 757 F.3d at 245 (citing *Rice* approvingly in interpreting § 1505 generally).

No. 21-11225
c/w No. 21-11228

## III

Drs. Gibbs and Hirjee allege various errors committed by the district court at trial.  Dr. Gibbs argues that the jury charge on Count Fifteen, conspiracy to obstruct justice, constructively amended the superseding indictment.  Dr. Hirjee challenges the denial of her motion for a new trial, the jury charge on Count Fourteen, and an evidentiary ruling.  She also argues that, taken together, these errors deprived her of a fair trial.

## A

Dr. Gibbs argues that the jury charge on Count Fifteen constructively amended the superseding indictment.  We review a preserved claim of constructive amendment de novo, and an unpreserved claim for plain error.[45] Dr. Gibbs did not raise his constructive amendment arguments in the district court, so our review is for plain error.[46]  Because the district court properly instructed the jury to consider the crime as charged in the superseding indictment, Dr. Gibbs has not shown plain error.

A constructive amendment occurs "when the government changes its theory at trial, allowing the jury to convict on a broader basis than that alleged in the indictment, or when the government proves an essential element of the crime on an alternate basis authorized by the statute but not charged in the indictment."[47]  "In this circuit, a constructive amendment occurs when the court 'permits the defendant to be convicted upon a factual basis that

---

[45] *United States v. Chaker*, 820 F.3d 204, 210, 213 (5th Cir. 2016).

[46] *See United States v. Dupre*, 117 F.3d 810, 816 (5th Cir. 1997) ("[U]nder Rule 30 of the Federal Rules of Criminal Procedure, these proposed instructions do not preserve error on appeal, absent an objection specific to the counts at issue."); *United States v. Rosenthal*, 805 F.3d 523, 530 (5th Cir. 2015).

[47] *United States v. Stanford*, 805 F.3d 557, 566 (5th Cir. 2015) (citing *United States v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011)).

27

No. 21-11225
c/w No. 21-11228

effectively modifies an essential element of the offense charged' or upon 'a materially different theory or set of facts than that which [the defendant] was charged.'"[48]    "In evaluating whether a constructive amendment has occurred, we consider 'whether the jury instruction, taken as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them.'"[49]

As discussed above with respect to the sufficiency of the evidence for this count, to prove a violation of § 1505 the Government must prove that (1) there was an agency proceeding; (2) the defendant was aware of that proceeding; and (3) the defendant intentionally endeavored corruptly to influence, obstruct, or impede the pending proceeding.[50]    The jury was charged with the following instruction:

| First: | That there was an agency proceeding; |
|---|---|
| Second: | That the Defendant was aware of that agency proceeding; |
| Third: | That the Defendant intentionally endeavored to influence, obstruct or impede that proceeding; and |
| Fourth: | That the Defendant's act was done "corruptly," that is, the Defendant acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice. |

_____

[48] *Chaker*, 820 F.3d at 210 (alteration in original) (quoting *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010)).

[49] *United States v. Jara–Favela*, 686 F.3d 289, 299-300 (5th Cir. 2012) (quoting *United States v. Guidry*, 406 F.3d 314, 321 (5th Cir. 2005)).

[50] *See United States v. Warshak*, 631 F.3d 266, 325 (6th Cir. 2010); *United States v. Quattrone*, 441 F.3d 153, 174 (2d Cir. 2006); *United States v. Bhagat*, 436 F.3d 1140, 1147 (9th Cir. 2006).

28

No. 21-11225
c/w No. 21-11228

Dr. Gibbs argues that the charge "impermissibly broadened the allegations from the indictment" by failing to specify (1) the ways in which Dr. Gibbs was alleged to have influenced, obstructed, or impeded that proceeding and (2) the CMS proceeding as the agency proceeding.

The district court instructed the jury to consider the jury instructions in light of the crimes charged in the superseding indictment. The superseding indictment was read to the jury at the beginning of trial, and a redacted copy was provided to the jury for use during deliberations. The jury instructions stated that "[n]o Defendant is on trial for any act, conduct, or offense not alleged in the Superseding Indictment." As to Count Fifteen, the charge stated that the jury "must be convinced that the Government has proven . . . beyond a reasonable doubt" that Dr. Gibbs "and at least one other person made an agreement to commit the crime of obstruction of justice as charged in Count Fifteen of the Superseding Indictment." The superseding indictment stated that Dr. Gibbs "caus[ed] Medicare to pay for hospice services through [Dependable's] provider number, so that they and Novus could continue to receive Medicare funds despite being on notice that Novus was the subject of a pending proceeding and suspended from receiving Medicare monies by CMS." The superseding indictment listed Dr. Gibbs's acts as "discuss[ing] the best way to circumvent the CMS suspension and continue receiving payment for hospice services rendered by Novus" and "agree[ing] to and serv[ing] as the medical director of [Dependable]." Further, the only agency proceeding mentioned in the superseding indictment is the CMS proceeding. The charge also explained that "[a]n investigation by the Centers for Medicare and Medicaid Services constitutes an agency proceeding."

No. 21-11225
c/w No. 21-11228

Because jurors are presumed to follow the court's instructions,[51] and the district court properly instructed the jury to consider the crime as charged in the superseding indictment, we find no plain error here. As there is no error, we decline to address the Government's argument that Dr. Gibbs invited the error.

## B

Dr. Hirjee raises three claims of error relating to the conduct of her trial, and she further argues that these errors, taken cumulatively, deprived her of a fair trial. First, she argues that the district court erred by denying her motion for a new trial. Second, she argues that, based on Supreme Court precedent decided after her trial but before this appeal, her jury instruction was plainly erroneous. Third, she argues that the district court erred by admitting certain evidence over her objection. We find no error.

### 1

We review the district court's decision to deny a motion for new trial "only for an abuse of discretion."[52] "A judge's power to grant a new trial based on a different assessment of the evidence must be 'exercised with caution' and 'invoked only in exceptional cases.'"[53]

Dr. Hirjee argues that the "evidence here preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." She points to much the same evidence she cited for her challenges to the sufficiency of the evidence. As discussed above, there was

---

[51] *See United States v. Bieganowski*, 313 F.3d 264, 288 (5th Cir. 2002).

[52] *United States v. Crittenden*, 46 F.4th 292, 297 (5th Cir. 2022) (en banc).

[53] *Id.* (quoting *United States v. Sinclair*, 438 F.2d 50, 51 n.1 (5th Cir. 1971)).

30

sufficient evidence presented at trial to support the jury's verdicts. The district court did not abuse its discretion in denying the motion for a new trial.

Aside from her evidentiary arguments, Dr. Hirjee also suggests that a new trial is warranted because "the Government may have tried and failed to find an expert to testify that Dr. Hirjee referred ineligible patients to hospice care, and the Government did not disclose as much to the defense." Dr. Hirjee did not raise this argument in the district court, and we decline to consider it on appeal.[54]

## 2

Next, Dr. Hirjee argues that, based on the Supreme Court's decision in *Ruan v. United States*, the jury charge on Count Fourteen was erroneous because it failed to require the correct *mens rea*. "[W]hen a defendant fails to object to jury instructions, we review for plain error."[55]

As an initial matter, the Government argues that Dr. Hirjee waived this argument by inviting the error. Generally, the invited-error doctrine applies to jury instructions.[56] The Government states that Dr. Hirjee "proposed nearly the exact instruction that she challenges now, including the instruction of good faith," precluding our review of this claim. Dr. Hirjee responds that "the invited-error doctrine does not apply when a party relied [below] on settled law that changed while the case was on appeal." For this

---

[54] *See Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017).

[55] *United States v. Huntsberry*, 956 F.3d 270, 282 (5th Cir. 2020) (quoting *United States v. Vasquez*, 677 F.3d 685, 692-93 (5th Cir. 2012) (per curiam)).

[56] *United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 606-07 (5th Cir. 1991) (explaining that this court "has made clear that the invited error doctrine applies to jury instructions" and collecting cases).

No. 21-11225
c/w No. 21-11228

proposition, she cites two published out-of-circuit cases[57] and one unpublished out-of-circuit case,[58] and at least one other circuit appears to take Dr. Hirjee's position.[59]  As explained below, Dr. Hirjee cannot show plain error.  Accordingly, we decline to decide the applicability of invited error here.[60]

Because Dr. Hirjee did not object to the jury instructions on this basis in the district court, we review for plain error.[61]  "A jury charge is plain error if: (1) it was erroneous; (2) the error was plain; and (3) the plain error affected the substantial rights of the defendant."[62]  If those conditions are met, "we have discretion to correct the error; discretion we will exercise if the error

---

[57] *United States v. Titties*, 852 F.3d 1257, 1264 n.5 (10th Cir. 2017); *United States v. Nasir*, 982 F.3d 144, 173 n.35 (3d Cir. 2020) (en banc), *cert. granted, judgment vacated*, 142 S. Ct. 56 (2021).

[58] *United States v. Coffelt*, 529 F. App'x 636, 639 (6th Cir. 2013) (unpublished).

[59] *See, e.g.*, *United States v. Andrews*, 681 F.3d 509, 517 n.4 (3d Cir. 2012) ("[W]e have previously held that '[w]here a defendant submits proposed jury instructions in reliance on current law' and while his case is on direct appeal, the law is found to be constitutionally problematic, we will not apply the 'invited error' doctrine.  Instead, we review for plain error.  This is consistent with the Supreme Court's definition of waiver as the 'intentional relinquishment or abandonment of a *known right*.'" (citations omitted)).

[60] *See United States v. Martinez–Vega*, 471 F.3d 559, 563 n.4 (5th Cir. 2006) ("Additionally, because we conclude that Appellant has failed to satisfy the plain error test, we need not reach the question of whether Appellant's admission constituted invited error.").

[61] *See United States v. Percel*, 553 F.3d 903, 908-09 (5th Cir. 2008) ("Generally, incorrect jury instructions are not considered structural errors, and because neither [defendant] objected to the jury instruction in the district court, we review the instruction for plain error." (footnotes omitted)).

[62] *United States v. Daniels*, 252 F.3d 411, 414 (5th Cir. 2001).

32

No. 21-11225
c/w No. 21-11228

'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"[63]

In *Ruan*, the Supreme Court held that "[a]fter a defendant produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so."[64] "In other words, the defendant must *subjectively* understand the illegitimate nature of the distribution they facilitate to commit an offense under [21 U.S.C.] § 841(a)."[65] The jury instructions on Count Fourteen instructed the jury that the culpable mental state attached only to whether Dr. Hirjee dispensed or distributed a controlled substance. Accordingly, the district court plainly erred with this jury charge.[66] The Government concedes that Dr. Hirjee can show the first and second prongs of plain error. The following discussion focuses on the third and fourth prongs.

As to the third prong, "[Dr. Hirjee] has the burden of showing that, if the District Court had correctly instructed the jury on the *mens rea* element of a [distribution-of-a-controlled-substance] offense, there is a 'reasonable probability' that [s]he would have been acquitted."[67] Dr. Hirjee argues that the "Government here entirely failed to show that Dr. Hirjee knew she was

_____

[63] *Id.* (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

[64] 142 S. Ct. 2370, 2375 (2022).

[65] *United States v. Ajayi*, 64 F.4th 243, 247 (5th Cir. 2023) (per curiam) (citing *Ruan*, 142 S. Ct. at 2381).

[66] *See United States v. Escalante–Reyes*, 689 F.3d 415, 423 (5th Cir. 2012) (en banc) ("[W]here the law is unsettled at the time of trial but settled by the time of appeal, the 'plainness' of the error should be judged by the law at the time of appeal.").

[67] *See Greer v. United States*, 141 S. Ct. 2090, 2097 (2021) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004)).

acting in an unauthorized manner or intended to do so." She refers the court to the discussion of sufficiency of the evidence as to Count Fourteen. The Government responds that Dr. Hirjee "cannot show any chance—let alone a reasonable probability—that a properly instructed jury would have found that she believed that she was acting in [an] authorized manner when she pre-signed the blank prescription that Murphey used to order hydromorphone for L.V." The Government goes on to argue that Dr. Hirjee "falls back on the argument that pre-signing prescriptions was a widespread practice among hospices," which "conflates the practice of pre-signing prescriptions for use by designated nurses employed by the doctor with Hirjee's practice of pre-signing prescriptions for use by Harris and Murphey."

The Government makes the stronger argument. Both Harris and Murphey testified about Dr. Hirjee, a medical doctor, leaving pre-signed, blank prescription pads for controlled substances under her doormat. In one exchange, Dr. Hirjee told Harris the pre-signed triplicates were "outside in [N]ordstrom bag," and Harris responded, "[I] am going to have [N]ick pick it up. He's my assistant since back to [previous company] we can trust him." In another exchange with Harris, Dr. Hirjee texted, "Hope triplicates are still there lol." Given the evidence presented on Count Fourteen, had the jury been properly instructed on *mens rea*, Dr. Hirjee has not shown a reasonable probability that she would have been acquitted.

Even if Dr. Hirjee satisfies the first three prongs, we will only exercise our discretion to correct the error if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Dr. Hirjee contends that the fourth prong is "easily satisfied" because she "is or could be innocent." According to the Government, it would be a miscarriage of justice to reverse Dr. Hirjee's conviction. The Government again highlights Dr. Hirjee's "own text messages," which reveal she was "beyond cavalier with her prescription pad." It also points to the conclusion in the Pre-

No. 21-11225
c/w No. 21-11228

Sentencing Report (PSR) that "[a] review of 485 triplicates pre-signed by Hirjee showed that 344 of them were filled in by a coconspirator."[68]

Dr. Hirjee has not shown that her rights were substantially affected by the jury instruction on Count Fourteen, nor that allowing any error to stand would seriously affect the fairness, integrity, or public reputation of judicial proceedings.

**3**

At trial, the Government introduced Exhibit 32, a chart and graphs showing when Dr. Hirjee's patients were admitted to hospice and how long they lived thereafter. Dr. Hirjee objected under Federal Rule of Evidence 403, arguing that the evidence had little probative value. The district court overruled this objection and allowed Dr. Hirjee to cross-examine the Government's witnesses on the evidence.

"A district court's ruling as to Rule 403 is reviewed 'with an especially high level of deference to the district court, with reversal called for only rarely and only when there has been a clear abuse of discretion.'"[69] "[T]he application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[70] Further, "[a]ny error in admitting such evidence is subject to harmless error review,

---

[68] *See id.* at 2098 ("This Court has repeatedly stated that an appellate court conducting plain-error review may consider the *entire* record—not just the record from the *particular proceeding* where the error occurred.").

[69] *United States v. Sims*, 11 F.4th 315, 323 (5th Cir. 2021) (quoting *United States v. Dillon*, 532 F.3d 379, 387 (5th Cir. 2008)), *cert. denied*, 142 S. Ct. 827 (2022).

[70] *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007) (alteration in original) (quoting *United States v. Pace*, 10 F.3d 1106, 1116 (5th Cir. 1993)).

and reversal is not required unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction."[71]

Dr. Hirjee argues that Exhibit 32 had minimal probative value because the "Government did not allege that any of Dr. Hirjee's patients were ineligible for hospice care." This argument assumes that Exhibit 32 was introduced to show that Dr. Hirjee admitted and recertified patients who were ineligible for hospice. Rather, as the Government explains, Exhibit 32 was probative because it tended to establish that Dr. Hirjee "enabled Harris to enroll the patients he chose by pre-signing physician's orders for admittance." In other words, Exhibit 32 tended to prove that the scheme operated as the Government described—"profitable" patients were admitted to Novus. Further, we have recognized that hospice patients outliving the "six-months-to-live eligibility requirement" can be circumstantial evidence which corroborates coconspirators' testimony that certifications were fabricated.[72]

Dr. Hirjee also argues that Exhibit 32 misled the jury by suggesting that Dr. Hirjee placed patients on hospice who were not eligible. As discussed for the sufficiency of the evidence challenges in Section II.A.2, the theory of fraud was not that Dr. Hirjee enrolled ineligible patients, but that she lent her signature so that non-medical staff could admit patients to

---

[71] *Sims*, 11 F.4th at 323 (quoting *United States v. Williams*, 620 F.3d 483, 492 (5th Cir. 2010)).

[72] *See United States v. Mesquias*, 29 F.4th 276, 282 (5th Cir.), *cert. denied sub nom. McInnis v. United States*, 143 S. Ct. 115 (2022), *and cert. denied sub nom. Mesquias v. United States*, 143 S. Ct. 269 (2022).

hospice.  While Exhibit 32 may have risked misleading the jury, that risk did not substantially outweigh the probative value of the evidence.[73]

Even if the district court erred in admitting Exhibit 32, we will not reverse unless there is a reasonable possibility that Exhibit 32 contributed to the conviction.[74]  Dr. Hirjee argues that "[i]t's at least reasonably possible that the Government's suggestion tipped the scales and that the jury concluded that improper hospice admissions rendered Dr. Hirjee guilty despite the Government's failure to prove that she cut any corners."  She also points out that the Government mentioned Exhibit 32 in closing.  Given the substantial evidence supporting the verdict, we cannot say that Exhibit 32 contributed to Dr. Hirjee's conviction.

The district court did not abuse its discretion in admitting Exhibit 32 over Dr. Hirjee's Rule 403 objection.  Further, even if the district court did err, any error was harmless given the other evidence presented at trial.

**4**

Last, Dr. Hirjee argues that the district court's combined errors— "erroneously instructing the jury in the charge, admitting a chart and graphs showing how long many of Dr. Hirjee's patients lived, and providing the jury with a transcript of a portion of a witness's testimony"—denied her a fair trial.

"'Cumulative error' justifies reversal only when errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'"[75]

---

[73] *See Fields*, 483 F.3d at 354 ("[T]o warrant exclusion, the danger of unfair prejudice . . . must *substantially* outweigh the probative value of the evidence.").

[74] *See Sims*, 11 F.4th at 323.

[75] *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc) (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)).

No. 21-11225
c/w No. 21-11228

"Though this is possible in theory, arguments for cumulative error are 'practically never found persuasive.'"[76]  "Because we have found that the district court did not commit reversible error in any of the issues presented in this case, 'there are no errors that we could aggregate to find cumulative error.'"[77]

## IV

Dr. Gibbs and Little raise challenges to their sentences.  Dr. Gibbs argues that the restitution ordered against him is improper.  Little likewise challenges her restitution order, as well as various other adjustments applied by the district court.

## A

Dr. Gibbs challenges his restitution amount by "incorporat[ing] his arguments for the sufficiency of the evidence and appl[ying] them to the nearly twenty-eight million dollars in restitution that the trial court ordered." Because his sufficiency challenges fail as explained above in Sections II.A.1, II.B.2, and II.D, we do not further address the propriety of Dr. Gibbs's restitution order.

## B

Little argues that the district court miscalculated the applicable restitution and sentencing range under the 2021 U.S. Sentencing Guidelines

---

[76] *United States v. Nicholson*, 961 F.3d 328, 339 (5th Cir. 2020) (quoting *United States v. De Nieto*, 922 F.3d 669, 681 (5th Cir. 2019)).

[77] *United States v. Herman*, 997 F.3d 251, 275 (5th Cir. 2021) (quoting *United States v. Eghobor*, 812 F.3d 352, 361 (5th Cir. 2015)), *cert. denied*, 142 S. Ct. 787 (2022); *see also Delgado*, 672 F.3d at 344 ("Because we have rejected [defendant's] other allegations of error, and non-errors have no weight in a cumulative error analysis, there is nothing to accumulate.").

No. 21-11225
c/w No. 21-11228

Manual by determining an incorrect loss amount and erroneously applying multiple adjustments. The specific adjustments she challenges are (1) obstruction of justice enhancement under § 3C1.1; (2) vulnerable victim enhancement under § 3A1.1(b)(1); and (3) minor/minimal role reduction under § 3B1.2.

The district court determined that Little's Guidelines range was 41 to 51 months of imprisonment, and it sentenced her to 33 months, a below-Guidelines sentence. The PSR initially recommended $1,382,899 be ordered in restitution, but the district court ultimately ordered Little to pay $366,493.12 in restitution jointly and severally with several codefendants. Although Little's term of imprisonment has ended, her challenges to her sentence are not moot because she remains subject to a term of supervised release, an element of the overall sentence.[78]

We first address the restitution order and then the Guidelines adjustments. We review the district court's application of the Guidelines de novo and its factual findings for clear error.[79]

_____

[78] *See United States v. Lares–Meraz*, 452 F.3d 352, 355 (5th Cir. 2006) (per curiam) (citing *United States v. Clark*, 193 F.3d 845, 847 (5th Cir. 1999)); *see also United States v. Vega*, 960 F.3d 669, 674 (5th Cir. 2020) (describing *Lares–Meraz* as holding that "a defendant may challenge his *term of imprisonment* as long as he remains under an active term of supervised release"); *Greene v. Underwood*, 939 F.3d 628, 628 (5th Cir. 2019) ("On July 19, 2019, during the pendency of this appeal, Greene was released from BOP custody. Nevertheless, because 'a district court may exercise its discretion to modify an individual's term of supervised release, taking into account that an individual has been incarcerated beyond the proper expiration of his prison term,' this appeal is not moot." (quoting *Johnson v. Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006) (per curiam))).

[79] *United States v. Mahmood*, 820 F.3d 177, 192 (5th Cir. 2016).

No. 21-11225
c/w No. 21-11228

**1**

Little argues that the district court determined an incorrect loss amount, resulting in an incorrect restitution order and an incorrect offense level for calculating the sentencing range.  Section 2B1.1(b)(1) of the Guidelines provides that the amount of loss resulting from a crime involving fraud is a specific offense characteristic that increases a defendant's base offense level.  A sentencing "court need only make a reasonable estimate of the loss,"[80] but the amount of loss must account for "the fair market value of the . . . services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."[81]  "The district court's loss calculation is generally a factual finding [reviewed] for clear error."[82]  "There is no clear error if the district court's finding is plausible in light of the record as a whole."[83]  "[W]e review '*de novo* how the court calculated the loss, because that is an application of the guidelines, which is a question of law.'"[84]

The district court adopted the PSR's findings as to the total loss amount.  The PSR determined the total loss to be $366,493.12, which was based on the amount Medicare paid for seventeen patients who were found via the Express Medical database.  Little argues that the district court erred in failing to (1) exclude eight claims for patients who died within four years of being enrolled as hospice patients, and (2) offset the remaining nine

---

[80] U.S.S.G. § 2B1.1 cmt. n.3(C).

[81] *Id.* § 2B1.1 cmt. n.3(E)(i).

[82] *Mahmood*, 820 F.3d at 192.

[83] *United States v. Mathew*, 916 F.3d 510, 516 (5th Cir. 2019) (quoting *United States v. Harris*, 597 F.3d 242, 250 (5th Cir. 2010)).

[84] *Mahmood*, 820 F.3d at 192 (quoting *United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008)).

No. 21-11225
c/w No. 21-11228

patients' claims by the amount Medicare would have paid for home health services.

First, Little argues that the loss amount should not include the patients who lived fewer than four years after being admitted to hospice. As she puts it, the eight patients she identified should be excluded from the loss calculation because "[a]ll eight passed well within the expected timeframe of four years stated by the government's expert witness in her testimony of possible life expectancy after hospice admission." Little does not cite authority for this proposition, and the Government argues that Little waived her arguments on this point due to inadequate briefing. The district court did not err in including all of the patients for the loss-amount calculation.

Second, Little argues that the loss amount should be offset by the value of the services provided. In healthcare fraud cases, a defendant is entitled to have Medicare's actual loss amount offset by the value of legitimate services provided to the patients.[85] To be entitled to such an offset for purposes of restitution, the defendant must establish that (1) the services she provided to Medicare beneficiaries were legitimate, and (2) Medicare would have paid for those services but for her fraud.[86] "The defendant has the burden of proof to establish each of these factors."[87]

---

[85] *United States v. Ricard*, 922 F.3d 639, 658-59 (5th Cir. 2019); *see also Mahmood*, 820 F.3d at 193-94.

[86] *Mathew*, 916 F.3d at 521.

[87] *Id.* (citing *Mahmood*, 820 F.3d at 194).

41

No. 21-11225
c/w No. 21-11228

In *United States v. Mahmood*,[88] we compared two cases to guide the analysis: *United States v. Klein*[89] and *United States v. Jones*.[90]   Those two examples are relevant here.   In *Klein*, "even though the defendant fraudulently billed services related to the medications, neither party disputed that the patients needed those medications or that the insurance companies would have had to pay for the medications had the defendant not fraudulently billed them."[91]  In *Jones*, "we concluded that 'Medicare pays for treatments that meet it[s] standards' and that the defendants' treatments using unlicensed personnel did not meet those standards."[92]  Little's case is more like *Jones*.   The seventeen patients identified for calculating Medicare's losses were "categorically ineligible for the hospice benefit because they were not terminally ill, and/or . . . were enrolled in hospice using falsified admittance orders."   The Government met its burden of showing that Medicare would not have paid for these claims because they do not meet Medicare's standards, and so Little is not entitled to any offset for the services provided.

In light of the record, the district court made a reasonable estimate of the loss amount.  We find no error.

**2**

Little next argues that that district court erred by applying the obstruction-of-justice enhancement.   The Supreme Court has instructed sentencing courts to address each element of the alleged perjury in a separate

---

[88] 820 F.3d 177 (5th Cir. 2016).

[89] 543 F.3d 206 (5th Cir. 2008).

[90] 664 F.3d 966 (5th Cir. 2011).

[91] *Mahmood*, 820 F.3d at 193 (citing *Klein*, 543 F.3d at 214-15).

[92] *Id.* (citing *Jones*, 664 F.3d at 984).

and clear finding when applying this enhancement.[93]  Here, the PSR adopted the Government's objection, and the district court adopted the PSR.  This satisfies the requirement of separate and clear findings.  Further, based on our review of the record, it is plausible that Little committed perjury; the district court did not clearly err in applying the enhancement.

Little preserved her objection to the obstruction-of-justice enhancement.   Section 3C1.1 of the Guidelines imposes a two-level enhancement if

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.[94]

"Generally, we review the district court's interpretation and application of the guidelines de novo and its 'factual findings, such as a finding of obstruction of justice, for clear error.'"[95]  A factual finding is not clearly erroneous so long as it is plausible in light of the record as a whole.[96]

Initially, the PSR did not recommend a sentencing enhancement for obstruction of justice.  The Government objected, contending that Little provided false and perjurious testimony at trial.  The PSR was amended to reflect a two-level enhancement for obstruction of justice.  Little objected,

---

[93] *United States v. Dunnigan*, 507 U.S. 87, 95 (1993).

[94] U.S.S.G. § 3C1.1.

[95] *United States v. Perryman*, 965 F.3d 424, 426-27 (5th Cir. 2020) (quoting *United States v. Huerta*, 182 F.3d 361, 364 (5th Cir. 1999)).

[96] *See Huerta*, 182 F.3d at 364.

No. 21-11225
c/w No. 21-11228

and the second addendum to the PSR retained the enhancement over her objection. This issue was not addressed at sentencing.

First, Little argues that the district court failed to comply with the Supreme Court's instruction in *United States v. Dunnigan*[97] that trial courts applying § 3C1.1 enhancements make clear findings of perjury. In *Dunnigan*, the Court explained that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding."[98] A § 3C1.1 enhancement survives review when a trial court makes a single finding that "encompasses all of the factual predicates for a finding of perjury."[99] "The trial court may make such a finding by adopting a PSR that contains adequate findings."[100]

Here, the Government submitted "lengthy, detailed objections to the PSR," several of which were included in the PSR addendum. The district court adopted the PSR. This amounted to the district court making a finding of an obstruction that encompasses all of the factual predicates for a finding of perjury. The district court did not violate *Dunnigan*.

Second, Little argues that the Government did not "prove prosecutable perjury." "In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute."[101] "A witness testifying under oath or affirmation violates this statute if she gives false

_____

[97] 507 U.S. 87 (1993).

[98] *Id.* at 95.

[99] *Id.*

[100] *United States v. Ajayi*, 64 F.4th 243, 251 (5th Cir. 2023) (per curiam) (citing *United States v. Perez–Solis*, 709 F.3d 453, 470 (5th Cir. 2013)).

[101] *Dunnigan*, 507 U.S. at 94.

44

testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."[102]   Little contends that "[a]ny alleged inconsistencies in [her] testimony were certainly the result of a clouded memory after years from the initial events and trial, her confusion over an exceedingly complex series of legal and factual issues, and the high-stress environment that accompanies testifying in one's own defense when facing felony charges at a federal level."

The Government provides at least five instances of Little perjuring herself at trial.  Having reviewed Little's testimony at trial and the relevant exhibits, we conclude that the district court did not clearly err in imposing the enhancement.  Little's testimony was on matters central to her substantive healthcare fraud counts, and the Government provided examples of evidence directly refuting the claims Little made at trial.

Last, Little gestures to constitutional issues.  She did not raise these constitutional arguments when she objected to the obstruction-of-justice enhancement.  Because Little raises these objections for the first time on appeal, we decline to reach them.[103]

**3**

Next, Little argues that the district court erred in applying the vulnerable-victim enhancement. The district court did not err.  Little's fraud potentially harmed patients by exposing them to palliative care rather than curative care, making them victims for purposes of this enhancement. Further, it is plausible that other victims—individuals who could reasonably qualify for hospice care—were vulnerable to Little's fraud.

---

[102] *Id.*

[103] *See Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017).

No. 21-11225
c/w No. 21-11228

Little preserved this argument. Section 3A1.1(b)(1) of the Guidelines imposes a two-level increase when "the defendant knew or should have known that a victim of the offense was a vulnerable victim."[104] We have "drawn a distinction between fraud schemes that 'benefitted' patients" versus those in which patients were potentially harmed by the fraud scheme.[105] In a fraud scheme that exposes the patients to needless or unnecessary medical treatments, the patients are victims.[106] "The determination that a victim is vulnerable is a factual finding which the district court is best suited to make,"[107] and we review that determination for clear error.

In applying this enhancement, the PSR cited the use of pre-signed triplicates by those without medical licenses to prescribe medication to Novus patients. It concluded that a "preponderance of the evidence indicates that the hospice care patients were exposed to medication that was potentially unnecessary and/or physically harmful to their health." Little argues that she was unaware of the practice of using pre-signed triplicates to provide patients with prescription medication, and in any event, "all of [her]

---

[104] U.S.S.G. § 3A1.1(b)(1).

[105] *United States v. Valdez*, 726 F.3d 684, 693 (5th Cir. 2013).

[106] *See id.* at 693-94; *United States v. Burgos*, 137 F.3d 841, 844 (5th Cir. 1998) (per curiam) ("[A] reasonable fact finder could conclude that the patients were the victims of Burgos's fraudulent scheme. They were often admitted to the hospital needlessly or their stays in the hospital were extended beyond what was necessary . . . ."); *United States v. Sidhu*, 130 F.3d 644, 655 (5th Cir. 1997) ("Gifford's patients were often debilitated by pain or depression, and easily became addicted to the treatment proffered by Gifford to support his fraud. The record supports the conclusion that Gifford preyed upon vulnerable patients by addicting them to morphine in order to support his fraudulent billing scheme."); *see also United States v. Mazkouri*, 945 F.3d 293, 306 n.4 (5th Cir. 2019).

[107] *Burgos*, 137 F.3d at 843 (citing *United States v. Rocha*, 916 F.2d 219, 244-45 (5th Cir. 1990)).

No. 21-11225
c/w No. 21-11228

patients were benefit[t]ed by the services they received . . . and none were harmed or victimized in any way."

The district court did not clearly err in imposing the vulnerable-victim enhancement. As explained at trial, hospices provide palliative care, not curative care. By recruiting patients for Novus hospice and then admitting them without the requisite involvement of a medical director, Little risked exposing patients to the wrong type of medical treatments. This is distinguishable from other cases involving healthcare fraud and the vulnerable-victim enhancement in which we pointed to "needless or unnecessary" medical treatments as the potential harm to patients. Here, the potential harm stems from the *lack* of needed or necessary treatments because hospice provides a fundamentally different type of care. Placing ineligible patients on hospice potentially exposes them to harm, making them victims for purposes of § 3A1.1(b)(1). It is plausible in light of the record as a whole that these victims were vulnerable—Little and Harris were by design targeting patients who had common hospice diagnoses. In other words, these patients suffered from serious medical conditions, and it is plausible that this made them susceptible to Little's conduct.

Little acknowledges that the following issues are foreclosed under this circuit's precedents, but she preserves them for further review: (1) "whether, if there are vulnerable victims in this case, the enhancement would be proper, since there is no nexus in this case between the vulnerability of the victims and the success of the criminal activity," and (2) "that there were actually no vulnerable victims at all."

**4**

Last, Little argues that the district court erred in granting only a two-level reduction, rather than a four-level reduction, for Little's role in the offense. Little preserved this argument. Whether a defendant was a minor

or minimal participant for purposes of § 3B1.2 is a "factual determination reviewed for clear error."[108]  "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole."[109]  "As a preliminary matter, § 3B1.2 'does not provide an affirmative right to a [mitigating role] reduction to every actor *but* the criminal mastermind.'"[110]  Little "bore 'the burden of proving by a preponderance of the evidence that the adjustment [was] warranted.'"[111]

Originally, the PSR did not recommend a reduction for Little's minor/minimal role in the offense.  Little objected, arguing she (i) had a "paltry understanding of the scope and structure" of the conspiracy; (ii) had minimally participated in the planning, organization, or implementation of the conspiracy; (iii) possessed no decision-making authority and held no influence over Harris or Rizvi; (iv) minimally participated in the acts constituting the offense conduct; and (v) received only approximately $1,750 for her role.  The Government responded that "Little illegally recruited patients for hospice service; recruited other individuals to work for Novus; worked as both a marketer and a nurse; worked as a case manager; opened a branch office in Greenville; and was involved in the criminal conduct from April 2014 until October 2015."  The PSR addendum declined to apply the reduction.  Little again objected, reiterating her previous arguments.  At

---

[108] *United States v. McElwee*, 646 F.3d 328, 346 (5th Cir. 2011) (citing *United States v. Villanueva*, 408 F.3d 193, 204 (5th Cir. 2005)).

[109] *United States v. Castro*, 843 F.3d 608, 612 (5th Cir. 2016) (quoting *Villanueva*, 408 F.3d at 203).

[110] *United States v. Bello–Sanchez*, 872 F.3d 260, 264 (5th Cir. 2017) (alteration and emphasis in original) (quoting *United States v. Gomez–Valle*, 828 F.3d 324, 331 (5th Cir. 2016)).

[111] *Castro*, 843 F.3d at 612 (alteration in original) (quoting *United States v. Miranda*, 248 F.3d 434, 446 (5th Cir. 2001)).

sentencing, the Government and Little presented argument.  The district court granted a two-level reduction.

The district court did not err in granting only a two-level reduction for Little's minor role in the offense.  It is plausible in light of the record as a whole that, while Little was "less culpable than most other participants in the criminal activity," she was not "plainly among the least culpable of those involved in the conduct of a group."[112]  Little did not bear her burden of showing otherwise.

*    *    *

For the foregoing reasons, we AFFIRM the judgment of the district court.

_____

[112] U.S.S.G. § 3B1.2 cmt. nn.4, 5.